PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————

No. 10-2204

—————

UNITED STATES OF AMERICA,

                                        Appellant

v.

PAUL W. BERGRIN; YOLANDA JAUREGUI,
a/k/a Yolanda Bracero;
THOMAS MORAN;
ALEJANDRO BARRAZA-CASTRO,
a/k/a George; VICENTE ESTEVES,
a/k/a Vinny

—————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 09-cr-00369)
District Judge:  Honorable William J. Martini

—————

Argued December 15, 2010
Before:  RENDELL, JORDAN and HARDIMAN, *Circuit
Judges*.

(Filed:  April 12, 2011)

Steven G. Sanders [Argued]
Mark E. Coyne
Zach Intrater
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102-0000
    *Attorneys for Appellant*

Lawrence S. Lustberg [Argued]
Michael A. Baldassare
Joshua C. Gillette
Jennifer Mara
Gibbons
One Gateway Center
Newark, NJ 07102-5310
    *Attorneys for Defendant-Appellee Bergrin*

Christopher D. Adams
Walder, Hayden & Brogan
5 Becker Farm Road
3rd Floor
Roseland, NJ 07068-0000
    *Attorney for Defendant-Appellee Jauregui*

Anthony J. Iacullo
Iacullo, Martino & Marzella
247 Franklin Avenue
P.O. Box 110129
Nutley, NJ 07110-0000
    *Attorney for Defendant-Appellee Moran*

David B. Glazer
Glazer & Luciano

19-21 West Mount Pleasant Avenue
Livingston, NJ 07039-0000
        *Attorney for Defendant-Appellee Barraza-Castro*

John McGovern
2nd Floor
221 Washington Street
Newark, NJ 07102-0000
        *Attorney for Defendant-Appellee Esteves*

———————

OPINION OF THE COURT

———————

HARDIMAN, *Circuit Judge*.

This case arises under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c). The Government appeals the District Court's order dismissing a RICO indictment of attorney Paul W. Bergrin and his co-defendants. Because the indictment adequately pleaded a RICO violation, we will reverse and remand.

I

Bergrin is a high-profile defense attorney and former federal prosecutor from New Jersey who now stands accused of leading an extensive criminal enterprise from 2003 through 2009.

On November 10, 2009, a federal grand jury in Newark, New Jersey returned a thirty-nine count superseding indictment charging Bergrin and seven co-defendants with a

host of offenses, all allegedly connected through an "association-in-fact" enterprise called the Bergrin Law Enterprise (BLE or Enterprise). According to the indictment, the BLE was comprised of five individuals—Paul Bergrin; Yolanda Jauregui; Thomas Moran; Alejandro Barrazo-Castro; and Vicente Esteves—and four corporations—the law firm Pope, Bergrin & Verdesco, PA (PB&V); the Law Office of Paul W. Bergrin, PC; Premium Realty Investment Corp., Inc.; and Isabella's International Restaurant, Inc.[1]

The indictment alleged that Bergrin was the leader of the BLE and played an instrumental role in all of the Enterprise's six criminal schemes. His co-defendants' alleged roles differed by scheme, with each having significant involvement in at least one scheme and little or no involvement in others. The six alleged schemes, also listed as "racketeering acts," are summarized below:

1. Racketeering Act One: In 2003 and 2004, Bergrin, as a partner in PB&V, represented a client with the initials "W.B.," who was being held on federal drug trafficking charges. W.B. informed Bergrin during a private attorney-client visit that "K.D.M." was the government's key witness against him. Bergrin relayed that information to W.B.'s drug associates along with his own message that if they killed K.D.M., he could assure that W.B. escaped prison, but if they did not, W.B. would spend

---

[1] Three defendants named in the indictment—Alonso Barraza-Castro, Jose Jiminez, and Sundiata Koontz—were charged with individual substantive crimes, but were not alleged to be part of the BLE.

the rest of his life in jail. Those associates subsequently murdered K.D.M.

2.  Racketeering Acts Two and Three: In 2008 and 2009, Bergrin, through his law firm, Law Office of Paul W. Bergrin, PC, represented Esteves, who was charged with federal drug crimes in Monmouth County, New Jersey. "Under the guise of providing legitimate attorney services," Enterprise members Bergrin, Jauregui, and Moran assisted Esteves in arranging to have a witness against him murdered. Members of the BLE solicited a hitman to locate and kill the witness, traveled to meetings with the hitman, offered to assist the hitman in obtaining a gun, instructed the hitman on how to commit the murder, and then received $20,000 in cash for their services to Esteves.

3.  Racketeering Act Four: In 2009, Bergrin, through his law firm, Law Office of Paul W. Bergrin, PC, represented a client with the initials "R.J.," who was charged with robbing "M.P." in Essex County, New Jersey. Enterprise members Bergrin, Jauregui, and Moran bribed and assisted in bribing M.P., who was to testify for the government against R.J. They did so by causing a third party, "M.C.," to participate in telephone conversations with M.P., after which they paid M.P. $3,000 in cash to change his/her testimony.

4.  Racketeering Acts Five, Six, and Seven: From 2005 to 2009, Bergrin, Jauregui, and Barraza-

5

Castro—along with several non-Enterprise members—trafficked in kilogram quantities of cocaine "[u]nder the guise of conducting legitimate business" at Law Office of Paul W. Bergrin, PC, PB&V, Premium Realty Investment Corp., Inc, and Isabella's International Restaurant, Inc. As part of the operation, a "stash house" was maintained at Isabella's in Newark.

5. <u>Racketeering Acts Eight and Nine</u>: In 2004 and 2005, Bergrin, through his law firms, Law Office of Paul W. Bergrin, PC and PB&V, represented a client with the initials "J.I.," who ran a prostitution business in New York. Bergrin helped J.I. evade New Jersey Parole Board restrictions by telling the Board that J.I. worked at the Law Office of Paul W. Bergrin, PC. Bergrin also supported that claim with false paychecks drawn on Premium Realty Investment Corp., Inc. accounts. When J.I. was arrested again, Bergrin took over the prostitution business, but he too was caught and charged in New York. Following Bergrin's arrest for his role in the business, Jauregui solicited M.C.—*i.e.*, the "third party" in Scheme Three—to murder a witness against Bergrin. Jauregui then supplied M.C. with information about the witness and paid him/her $10,000.

6. <u>Racketeering Acts Ten, Eleven, Twelve, and Thirteen</u>: In 2005 and 2006, Bergrin and Jauregui committed and assisted others in

committing wire fraud relating to the sale of real estate properties to individuals they knew to have fraudulently obtained mortgage loans. They did so "[u]nder the guise of conducting [the] legitimate business" of the Law Office of Paul W. Bergrin, PC and Premium Realty Investment Corp., Inc. At least one of the properties was owned by Bergrin and Jauregui through Premium Realty. Bergrin and other attorneys from the Law Office of Paul W. Bergrin acted as closing attorneys on the transactions.

The indictment also alleged the following seven purposes of the Enterprise, which we quote in full:

> a. providing The Bergrin Law Enterprise and its leaders, members and associates with an expanding base of clients for legal and illegal services;

> b. generating, preserving and protecting The Bergrin Law Enterprise's profits and client base through acts of, among other things, witness tampering, murder, conspiracy to commit murder, traveling in aid of racketeering enterprises, bribery, drug trafficking, prostitution, wire fraud, and money laundering.

> c. protecting and preserving defendant PAUL BERGRIN's status as a licensed attorney;

7

d. enhancing defendant PAUL BERGRIN's reputation as a criminal defense attorney;

e. promoting and enhancing The Bergrin Law Enterprise and its leaders', members' and associates' activities;

f. enriching the leaders, members, and associates of The Bergrin Law Enterprise; and

g. concealing and otherwise protecting the criminal activities of The Bergrin Law Enterprise and its members and associates from detection and prosecution.

Bergrin, Jauregui, Moran, and Barazza-Castro were each charged in Count One with violating RICO, 18 U.S.C. §1962(c), and in Count Two with conspiring to violate RICO, § 1962(d).[2] Bergrin, Jauregui, Moran, and Esteves were also

---

[2] Section 1962(c) states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

charged in Count Three with the commission of violent crimes in aid of racketeering (VICAR), 18 U.S.C. § 1959(a).[3]

Bergrin and his co-defendants moved to dismiss the RICO and racketeering-based counts. On April 7, 2010, the District Court heard oral argument on whether the Government alleged in its indictment facts sufficient to support RICO charges. Two weeks later, the District Court granted the motions to dismiss Count One, finding that the

---

Section 1962(d) criminalizes "conspir[ing] to violate any of the provisions of subsection (a), (b), or (c) of this [§ 1962]."

[3] The VICAR statute applies to anyone who:

as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do.

18 U.S.C. § 1959(a).

indictment did not adequately allege a racketeering "enterprise" or a "pattern of racketeering activity." *United States v. Bergrin*, 707 F. Supp. 2d 503, 519 (D.N.J. 2010). Because charges of conspiracy to violate RICO and VICAR both require elements of an underlying RICO charge, Counts Two and Three were dismissed as well. *Id.* The Government filed this timely appeal.[4]

## II

"[W]hen reviewing a motion to dismiss an indictment, our standard of review is mixed, employing plenary or *de novo* review over a district court's legal conclusions, and reviewing any challenges to a district court's factual findings for clear error." *United States v. Shenandoah*, 595 F.3d 151, 156 (3d Cir. 2010) (citing *United States v. Nolan-Cooper*, 155 F.3d 221, 229 (3d Cir.1998)). "A finding is clearly erroneous when[,] although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (quoting *Concrete Pipes & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993)) (internal quotation marks omitted).

## III

### A

---

[4] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 because Bergrin and his co-defendants were charged with violating "offenses against the laws of the United States." We have jurisdiction over the District Court's order dismissing the indictment pursuant to 18 U.S.C. § 3731.

We begin our analysis by setting forth the requirements of a well-pleaded indictment and the rules governing a district court's review of a motion to dismiss.

Federal Rule of Criminal Procedure 7(c)(1) requires an indictment to "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." The Supreme Court has explained that "the Federal Rules 'were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure.' . . . While detailed allegations might well have been required under common-law pleading rules, . . . they surely are not contemplated by Rule 7(c)(1)." *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (citations omitted) (quoting *United States v. Debrow*, 346 U.S. 374, 376 (1953)). Likewise, we have held:

> [A]n indictment [is] sufficient so long as it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Vitillo*, 490 F.3d 314 (3d Cir.2007) (internal quotation marks omitted). Moreover, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir.1989).

*United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007).

To determine whether an indictment "contains the elements of the offense intended to be charged," a district court may look for more than a mere "recit[ation] in general terms [of] the essential elements of the offense." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002). A district court must find that "a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *Id.*; *see also United States v. Schiff*, 602 F.3d 152, 162–66 (3d Cir. 2010) (indictment alleging "failure to rectify misstatements of others" does not, as a matter of law, state an offense under securities statute that criminalizes omissions of information); *Gov't of V.I. v. Greenidge*, 600 F.2d 437, 438–40 (3d Cir. 1979) (indictment alleging assault on male companion of a rape victim does not, as a matter of law, state an offense under statute that criminalizes assaulting a rape victim).

A ruling on a motion to dismiss is not, however, "a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660–61 (3d Cir. 2000) (citations omitted). "Evidentiary questions"—such as credibility determinations and the weighing of proof—"should not be determined at th[is] stage." *United States v. Gallagher*, 602 F.2d 1139, 1142 (3d Cir. 1979). Rather, "[i]n considering a defense motion to dismiss an indictment, the district court [must] accept[] as true the factual allegations set forth in the indictment." *United States v. Besmajian*, 910 F.2d 1153,

12

1154 (3d Cir. 1990) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952)).

## B

Having reviewed the legal principles governing motions to dismiss indictments generally, we turn now to the specific question of what a RICO indictment must allege under 18 U.S.C. § 1962(c). In *United States v. Irizarry*, we elaborated on the pleading requirements thusly:

> To establish a § 1962(c) RICO violation, the government must prove the following four elements: "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated . . ., either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity."

341 F.3d 273, 285 (3d Cir. 2003) (quoting *United States v. Console*, 13 F.3d 641, 652-653 (3d Cir.1993)). We are also guided in our application of § 1962(c) by statutes and Supreme Court decisions that have more precisely defined the many operative words and phrases in the RICO law, including "enterprise" and "pattern of racketeering activity."

## 1

The United States Code defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated

13

in fact although not a legal entity." 18 U.S.C. § 1961(4). According to the indictment in this case, the BLE was "a group of individuals and legal entities associated in fact." The Supreme Court held in *United States v. Turkette*, 452 U.S. 576, 583 (1981)—and reaffirmed in *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009)—that such an "[association-in-fact] enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct," and it "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. . . . separate and apart from the pattern of activity in which it engages." In *Boyle*, the Court added that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." 129 S. Ct. at 2244. The Court also listed a number of structural elements that the government need *not* prove to establish an "enterprise":

> [A]n association-in-fact enterprise . . . . need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a

14

continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 2245–46.[5]

In order to be "employed by or associated with" a RICO enterprise, a defendant must be a "person" legally distinct from the "enterprise" with which the person is employed or associated. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). The Supreme Court recognized in *Cedric Kushner Promotions* that one person and one wholly-owned entity can be distinct. 533 U.S. at 163

---

[5] Long before *Boyle*, we held in *United States v. Riccobene* that establishing an enterprise requires proof of an "ongoing organization" with a "superstructure or framework," members who "each . . . perform a role in the group consistent with the organizational structure," and "an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses." 709 F.2d 214, 221-24 (3d Cir. 1983), *overruled by Griffin v. United States*, 502 U.S. 46 (1991). To the extent that this holding is inconsistent with *Boyle*, it is no longer good law. But even if *Riccobene* were unaffected by *Boyle*, our decision in this appeal would remain the same.

15

("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that. . . . [L]inguistically speaking, the employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner. After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." (citations omitted)). Courts have also recognized that an "association-in-fact" enterprise can exist—and satisfy the "distinctiveness" requirement—when it is comprised of members that are a mixture of individual persons and "entities that they control." *See, e.g.*, *United States v. Masters*, 924 F.2d 1362, 1366 (7th Cir. 1991) (Posner, J.) (finding an "enterprise" made up of a lawyer, his law firm, two police officers, and their respective police departments).

2

A "pattern of racketeering activity" is defined as "requir[ing] at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). It is the "person" charged with the racketeering offense—not the entire enterprise—who must engage in the "pattern of racketeering activity." *See H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 244 (1989).

"[T]o prove a pattern . . . a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that

16

they amount to or pose a threat of continued criminal activity." *Id.* at 239 (emphasis in original). "Relatedness" can be shown through evidence that the criminal activities "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (quoting 18 U.S.C. § 3575(e)). Crimes can be "interrelated by [a] distinguishing characteristic[]" when they are "committed pursuant to the orders of key members of the enterprise in furtherance of its affairs." *United States v. Pungitore*, 910 F.2d 1084, 1104 (3d Cir. 1990). "Continuity" includes "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.*, 492 U.S. at 241. "Closed-ended continuity" can be established "by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. A finding of "open-ended continuity," on the other hand, "depends on whether the *threat* of continuity is demonstrated." *Id.* (emphasis in original). Although "[f]or analytic purposes [relatedness and continuity] . . . must be stated separately, . . . in practice their proof will often overlap." *Id.* at 239.

"Racketeering activity" is defined by 18 U.S.C. §1961(1) to include dozens of crimes, including "any act or threat involving murder, . . . bribery, . . . or dealing in a controlled substance," as well as "any act which is indictable under . . . [18 U.S.C. §] 1343 (relating to wire fraud), . . . [18 U.S.C. §] 1512 (relating to tampering with a witness, victim, or an informant), . . . [and 18 U.S.C. §] 1952 (relating to racketeering)." In keeping with Congress's intent, the Supreme Court has recognized that racketeering activities of

17

criminal enterprises are often quite diverse and can include predicate offenses ranging from loan sharking and theft to trafficking in illicit prescription drugs and counterfeiting music albums. *Turkette*, 452 U.S. at 590 ("In view of the purposes and goals of the Act, as well as the language of the statute, we are unpersuaded that Congress nevertheless confined the reach of the law to only narrow aspects of organized crime . . . ." (citing Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 947 and 116 Cong. Rec. 592 (1970))). Because § 1961(1) casts such a wide net, RICO's reach can be exceptionally broad.

3

We are also guided by the Supreme Court's expansive interpretation of RICO. In numerous instances, the Court has been asked to impose limits on how RICO may be applied, and it has consistently declined to do so. Instead, the Court has repeatedly pointed to RICO's legislative history and §904(a) of the Organized Crime Control Act of 1970[6] as evidence that Congress intended to create a broad and powerful new statutory weapon for the federal government to wield against individuals like Bergrin and organizations like the BLE. *See Boyle*, 129 S. Ct. at 2244–47 (7-2 decision rejecting limitation that "enterprise" must have "an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages"); *Cedric Kushner Promotions*, 533 U.S. at 164–65 (unanimous decision rejecting limitation that president and sole shareholder of a company is not distinct "person" from wholly-owned

---

[6] 84 Stat. at 947 ("The provisions of this Title shall be liberally construed to effectuate its remedial purposes.").

18

company "enterprise"); *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256–62 (1994) (unanimous decision rejecting limitation that "enterprise" must have "an economic motive"); *Turkette*, 452 U.S. at 586–87 (1981) (8-1 decision rejecting limitation that "enterprise" must be legitimate entity); *see also H.J., Inc.*, 492 U.S. at 248–49 ("Congress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways. It would be counterproductive and a mismeasure of congressional intent now to adopt a narrow construction . . . . RICO may be a poorly drafted statute; but rewriting it is a job for Congress, if it is so inclined, and not for this Court."); *Russello v. United States*, 464 U.S. 16, 21 (1983) ("Congress selected [the] general term ["interest" in § 1963(a)] apparently because it was fully consistent with the pattern of the RICO statute in utilizing terms and concepts of breadth.").

With these definitions and points of reference in mind, we turn to the District Court's decision to dismiss the indictment in this case.

## C

Federal Rule of Criminal Procedure 12(b)(3)(B) allows a district court to review the sufficiency of the government's pleadings on "a motion alleging a defect in the indictment." The court is limited, however, in what it may consider during this analysis. Its determination must be based on whether the facts alleged in the indictment, if accepted as entirely true, state the elements of an offense and could result in a guilty verdict. *DeLaurentis*, 230 F.3d at 660–61 ("[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence. .

19

. . Federal Rule of Criminal Procedure 12(b)(2) [now 12(b)(3)(B)] authorizes dismissal of an indictment if its allegations do not suffice to charge an offense, but such dismissals may not be predicated upon the insufficiency of the evidence to prove the indictment's charges." (citations omitted)). Generally speaking, it is a narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury.

The District Court dismissed the indictment of Bergrin and his alleged co-conspirators based on its determination that "Count One . . . both fails to set forth a pattern of racketeering and an enterprise." *Bergrin*, 707 F. Supp. 2d at 519. Neither of these conclusions is correct; the indictment adequately alleges all of the sub-elements required to establish both a pattern of racketeering activity and an enterprise, as well as all of the other elements of a RICO offense.[7]

---

[7] Although some of the sub-elements are not explicitly discussed—for example, the indictment does not contain the words "closed or open-ended continuity"—the facts alleged are sufficiently numerous and detailed to "apprise[] the defendant of what he must be prepared to meet" and, if proven, provide an ample basis for a guilty verdict. *See United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978) ("A jury is entitled to infer the existence of an enterprise on the basis of largely or wholly circumstantial evidence."); *cf. Boyle*, 129 S. Ct. at 2244 ("Although an association-in-fact enterprise must have these structural features, it does not follow that a district court must use the term 'structure' in its jury instructions.").

1

The indictment alleges that the BLE constituted a RICO enterprise because it states this element of the charged offense, is sufficiently specific both to advise the defense of what it must be prepared to defend against and to allow recognition of a double jeopardy problem in future cases, and contains facts that fall within the scope of the RICO statute as a matter of law.

According to the indictment, the BLE was an "association-in-fact" of five individuals and four corporations that met all of the sub-elements outlined in *Turkette*. The indictment describes the BLE as a group of persons and entities that associated and engaged in a course of conduct (*i.e.*, a pattern of racketeering activity) for several common purposes (*e.g.*, to make money, expand its client base, etc.) and was an "ongoing organization" (though an informal one) comprised of associates who operated as a unit to provide illicit services to Bergrin's clients and one another. The indictment also alleges facts that satisfy the *Boyle* requirements: purpose, relationships among the members (though, again, relatively loose and informal), and longevity sufficient to enable the BLE to pursue its goals of, *inter alia*, making money and protecting its own members and criminal schemes.

Similarly, there are sufficient facts in the indictment to apprise the defense that the Government will seek to prove that the BLE is a distinct entity, not merely a different name for the individual RICO defendants. The Government alleges that the individual defendants (*i.e.*, the "persons") worked

together and in conjunction with multiple corporations to achieve long-term common goals, and thus each individual defendant was merely a part of, not an alter ego of, the "association-in-fact" enterprise. As the Supreme Court noted in *Cedric Kushner Promotions*, "[w]hether the Act seeks to prevent a person from victimizing, say, a small business, . . . or to prevent a person from using a corporation for criminal purposes, . . . the person and the victim, or the person and the tool, are different entities, not the same." 533 U.S. at 162 (citations omitted). Although *Cedric Kushner Promotions* dealt with the infiltration of legitimate businesses, not "association-in-fact" enterprises, the principle remains the same: if Bergrin and the other individual defendants are "the persons," the BLE is adequately alleged to be "the tool" that Bergrin directed.

The allegations supporting the "enterprise" element are not negated by the fact that the BLE pursued various predicate crimes. Rather, the BLE's versatility provides even stronger evidence that it was an ongoing association formed to pursue criminal objectives. *See, e.g.*, *Masters*, 924 F.2d at 1366; ("The strongest evidence [of an enterprise] is the handling of the problem of dealing with [the leader's cheating wife]. When that problem arose, a loose-knit but effective criminal organization was in place ready to respond effectively by planning and carrying out a . . . crime that would have been beyond the capacities of the individual defendants acting either singly or without the aid of their organizations.").

2

The indictment also alleges facts indicating that each individual defendant engaged in at least two predicate acts,

22

which is the basis for the assertion that each engaged in a "pattern of racketeering activity."[8]

First, it is undisputed that the indictment charges each RICO defendant with committing at least two predicate acts within the last ten years, thus certainly meeting the statutory threshold set forth in § 1961(5).

Second, the "relatedness" sub-element of *H.J. Inc.* is satisfied because the indictment states that the predicate crimes were all committed for "the same or similar purposes," *e.g.*, "promoting and enhancing the Bergrin Law Enterprise and its leaders', members' and associates' activities; enriching the leaders, members and associates of the Bergrin Law Enterprise; and concealing and otherwise protecting the criminal activities of the Bergrin Law Enterprise." Furthermore, there are several "distinguishing characteristics" that imply that the predicate crimes were "not isolated events." Most notably, four of the six schemes involved the performance of some kind of service for Bergrin's clients (*e.g.*, murdering witnesses against two clients, bribing a

---

[8] The Supreme Court has recognized that the government may use the same evidence to prove the pattern of racketeering activity and the enterprise. *Turkette*, 452 U.S. at 583; *Boyle*, 129 S. Ct. at 2246 n.5, 2247. At the motion to dismiss stage, the District Court had to accept as true all allegations in the indictment, regardless of its uncertainty as to how the Government would prove those elements at trial. The question is merely whether the indictment put the defendants on notice as to the nature of the charges against them, and whether the facts, if proven, are sufficient as a matter of law for a jury to convict.

witness against another, and helping a fourth run an illicit business).

Moreover, the indictment alleges both closed- and open-ended continuity. Regarding the former, the predicate offenses are alleged to have occurred over a "closed period of repeated conduct," *i.e.*, six years during which six criminal schemes were executed. Several of the schemes themselves occurred over a number of years and involved repeated conduct (*e.g.*, Scheme Four: a four-year drug trafficking conspiracy, which involved three individuals, four companies, and multiple predicate acts such as conspiracy to distribute five kilograms or more of cocaine, distribution of 500 grams or more of cocaine, and maintaining drug-involved premises). As to the latter, the alleged number of schemes and the BLE's apparent willingness to engage in criminal acts to aid Bergrin's clients suggest that there is also a "*threat* of continui[ng]" criminal activity in the future.

As was the case with the "enterprise" element, the fact that the BLE's alleged schemes differed from one another does not establish that, as a matter of law, there was no pattern. Congress intended for RICO to apply to individuals who, through involvement in an enterprise, commit any combination of the many and diverse predicate acts, whether the usual organized crime-type offenses (*e.g.*, bribery, extortion, gambling), more violent crimes (*e.g.*, murder, kidnapping), or more niche crimes (*e.g.*, counterfeiting music or trafficking in illicit prescription drugs). We are not alone in agreeing with Judge Posner's observation that "[a] criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities." *See United States v. Eufrasio*, 935 F.2d 553, 566 (3d Cir. 1991) (quoting *Masters*, 924 F.2d at 1367); *see also United States v.*

24

*Brandao*, 539 F.3d 44, 55 (1st Cir. 2008); *United States v. Eppolito*, 543 F.3d 25, 57 (2d Cir. 2008). In short, "[t]he acts of a criminal enterprise within the scope of the enterprise's evolving objectives form pattern enough to satisfy the requirements of the RICO statute." *Masters*, 924 F.2d at 1367.

We have also noted that "RICO's pattern requirement ensures that separately performed, functionally diverse and directly unrelated predicate acts and offenses will form a pattern under RICO, as long as they all have been undertaken in furtherance of one or another varied purposes of a common organized crime enterprise," *Eufrasio*, 935 F.2d at 566, as was the case with the BLE. Based on the kinds of commonalities listed in *H.J., Inc.*—*e.g.*, common purpose and direction from common leadership—we, as well as other circuit courts of appeals, have found patterns of racketeering activity in cases with equally (and in some cases, even more) disparate predicate crimes. *See, e.g.*, *id.* ("The murder conspiracy predicate was, for purposes of the pattern requirement, legally related to the gambling and extortion predicates, and they to each other, because all were undertaken to further varied and diverse Scarfo enterprise purposes, namely, to control, manage, finance, supervise, participate in and set policy concerning the making of money through illegal means. Each charged predicate was related one to the other also because each was carried out by Idone or members of his crew, pursuant to orders of 'key members of the enterprise', either Idone or Scarfo."); *Masters*, 924 F.2d at 1366–67 (finding pattern when defendants participated in kickback scheme between police departments and a law firm, bribery of police to ignore illegal gambling activity, and a conspiracy to commit and cover up the murder of one

25

enterprise member's cheating wife); *Elliott*, 571 F.2d at 884–95 (finding a pattern when predicate acts included arson, counterfeiting titles to stolen cars, stealing Hormel meat products, attempting to influence the outcome of "the stolen meat trial," stealing Swift meat and dairy products, stealing a forklift and ditchwitch, stealing "Career Club" shirts, engaging in illegal drug transactions, and plotting to steal fungicide).

D

Because the indictment in this case alleged facts sufficient to charge Bergrin and his co-defendants with RICO violations, it should have survived a motion to dismiss, and the District Court erred in finding to the contrary.

1

In our view, the District Court's principal error was its failure to accept as true all of the facts alleged in the indictment. The District Court treated *Panarella*—which calls for courts to determine whether "the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, *as a matter of statutory interpretation*," 277 F.3d at 685 (emphasis added)—as though it allows inquiry into what the Government will be able to prove at trial. Such factfinding is impermissible at the motion to dismiss stage. *Id.* at 681 ("For purposes of determining the sufficiency of the superseding information, we assume the truth of the . . . facts alleged."); *Console,* 13 F.3d at 650 ("The existence *vel non* of a RICO enterprise is a question of fact for the jury.").

26

In granting Appellees' motions to dismiss, the District Court relied in part on findings that the indictment failed to allege a common purpose or other commonality among the predicate acts.[9] On these points, the Court openly weighed the evidence and questioned the Government's ability prove that all of the purported members of the enterprise shared the alleged common purposes. The Court began by asserting that, "[a]lthough the Government attempts to tie together the disparate predicates by arguing that they each furthered the 'principal goals of the enterprise,' . . . the purposes offered in the Indictment undermine the assertion that the RICO persons share any such common objectives." *Bergrin*, 707 F. Supp. 2d at 512. The Court then listed four alleged purposes and concluded:

> Given these alleged objectives, it strikes the Court that each pertains to Paul Bergrin individually as an attorney. . . . The enhancement of Bergrin's reputation and the preservation of his law license are clearly of unique importance to Bergrin himself, as is the expansion of his law firm's client base. . . . *[I]t strains credulity to argue*, for example, that Alejandro Barraza-Castro, an alleged drug dealer, shared the aforementioned purposes regarding Bergrin's law license and his client base.

---

[9] This finding is especially problematic because, as discussed in Part III.B., *supra*, evidence of a common purpose can be used to prove both a "pattern of racketeering activity" and an "enterprise."

*Id.* at 513 (emphasis added).[10] On its face, the indictment contradicts the District Court's findings. The indictment avers *seven* (not four) common purposes, all of which cohere in light of the Government's allegation that *all* the members of the BLE benefited from Bergrin's status as a licensed attorney because "the special privileges granted to licensed attorneys" allowed them "to engage in and assist Client Criminals to engage in criminal activities." BLE members also, according to the indictment, shared the common purpose of "enriching the leaders, members and associates of The Bergrin Law Enterprise; and concealing and otherwise protecting the criminal activities of The Bergrin Law Enterprise and its members and associates from detection and prosecution." Moreover, the indictment alleges that certain entities (*i.e.*, PB&V and the Law Office of Paul W. Bergrin, PC) were used to commit the predicate acts. It also states, though admittedly without much elaboration, that the

---

[10] Similar examples can be found throughout the opinion. For instance, the Court lists the six schemes and the individuals accused of being involved in their commission, making no mention of the corporations also allegedly involved, and then concludes: "[T]his panoply of criminal activity has but one common denominator, Paul Bergrin . . . . [T]he Indictment's failure to set forth similar or common purposes, victims, manners of commission, or otherwise distinguishing characteristics relating these predicates warrants dismissal." *Bergrin*, 707 F. Supp. 2d at 512. Again, without mentioning the common purposes or entities involved, the Court refers to the Kemo murder case (Scheme One), stating: "This case shares nothing in common with the other schemes, save for the presence of Paul Bergrin." *Id.*

predicate acts were committed "[u]nder the guise of providing legitimate attorney services."

The District Court also opined that "[t]here is no core group alleged, other than Paul Bergrin himself," *id.* at 516, and that "'The Bergrin Law Enterprise' as pled is essentially Paul Bergrin, the licensed attorney, by another name," *id.* at 518.[11] These findings cannot be squared with the indictment, which identifies a number of BLE members, any combination of which a jury could find were the "core group."[12] Moreover, the notion that the BLE "is essentially Paul Bergrin" cannot be reconciled with the indictment's allegations that other individuals and entities joined together to form an "association-in-fact" enterprise—*i.e.*, a "union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Whether a jury will find that such an enterprise existed is an open question, but as a matter of law, the Government pleaded facts sufficient to support such a finding. The District Court was obliged to accept as those allegations as true.

---

[11] *See also id.* at 517 ("[L]ooking at the schemes alleged in the Indictment by date and by defendant, the facts belie any assertion that an enterprise existed before, during, or after [The BLE's alleged] growth and diversification.").

[12] Although reasonable minds might differ as to whether Moran or Isabella's International Restaurant were "core" members, the indictment alleges that Bergrin and one of his law firms were involved in every racketeering act, and that Jauregui joined in four of the six schemes.

29

In addition to making impermissible factual findings, the District Court also penalized the Government for failing to allege facts that are unrelated to any required element of a RICO offense. For example, the Court suggested that, to constitute a "pattern," the predicate acts must be similar in ways not actually required by the statute or judicial precedent (*e.g.*, that there must be similar methods employed or some temporal proximity linking the predicate acts).[13] The Court also suggested that proving the existence of a distinct RICO enterprise requires the Government to show that the enterprise's goals do not primarily benefit one specific member and that its operations do not too heavily rely on the skill or status of one specific member.[14] Lastly, the Court

---

[13] *See, e.g.*, *Bergrin*, 707 F. Supp. 2d at 512 ("[I]t is clear from the nature of the allegations that the Kemo murder case shares little, if anything, in common with the methods allegedly employed in the commission of the other predicates. . . . [I]t is evident on the face of these schemes that they lack any similarity in method."); *Id.* at 513("[T]he Indictment as pled offers a series of disconnected street crimes and white collar frauds carried out using divergent methods for distinct purposes at different times as the RICO 'pattern.'"); *Id.* at 516 ("There is no common criminal conduct; instead, the acts alleged range from prostitution to murder to mortgage fraud without any apparent overlap or coordination, again other than the presence of Paul Bergrin, over different periods of time.").

[14] *See, e.g.*, *id.* at 515 ("Each of the seven purposes pled in ¶ 7 of the Indictment inure to the benefit of Paul

opined that a RICO enterprise must have structure, defined leadership, organization, and history comparable to more traditional organized crime-type enterprises (*e.g.*, La Cosa Nostra).[15]

These factual averments are not required to prove a RICO case. *See supra* Part III.B. Indeed, the Supreme Court

Bergrin, as discussed above with regard to the pattern of racketeering."); *Id.* at 518 ("Through its focus on the misuse of legal services, the Government ties this enterprise together through Bergrin's status as an attorney. 'The Bergrin Law Enterprise' therefore is simply Paul W. Bergrin, Esq., without whom, as the Indictment states, none of the criminal schemes would be possible.").

[15] *See, e.g.*, *id.* at 515 ("No structure, or at best a minimal structure, is pled in the instant Indictment with regard to 'The Bergrin Law Enterprise.' Instead, the Government attempts to graft an enterprise onto the actions of Defendant Bergrin by alleging that he led 'The Bergrin Law Enterprise.' . . . The Indictment, however does not describe what this leadership entailed. Except for the labeling of Bergrin as the 'leader,' there is no discussion of the roles of the other associates, other than their commission of illegal acts. . . . This pleading stands in stark contrast to the typical form of a RICO Indictment. In an organized crime or union corruption RICO Indictment, for example, there is often a lengthy discussion of each associate's role in the enterprise and how the enterprise came to be. . . . There is no such pleading as to the history of the enterprise or the role of its members' roles here." (citations omitted)).

in *H.J., Inc.* used a disjunctive list when explaining what constitutes evidence of a "pattern of racketeering activity": "criminal acts that have the same or similar purposes, results, participants, victims, *or* methods of commission, *or* otherwise are interrelated by distinguishing characteristics and are not isolated events." 492 U.S. at 240 (emphasis added) (citation omitted). The "methods employed" need not be similar; in fact, it is hard to imagine how they could be similar in cases where the predicate acts themselves are fundamentally different (*e.g.*, extortion, drug trafficking, gambling, murder, and counterfeiting music albums). *Boyle* also makes clear that there need not be a rigid temporal relationship among predicate acts. 129 S.Ct. at 2245 ("While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence."). Neither the District Court nor the Appellees cite any authority that stands for the proposition that there is no "enterprise" if an association-in-fact forms for purposes that primarily benefit one member or operates with total dependence on one member. Finally, the Supreme Court has repeatedly, and most explicitly in *Boyle*, rejected the notion that a RICO enterprise must have the type of structure, defined leadership, organization, or history generally associated with traditional organized crime associations. *Id.* at 2245–46; *see also H.J., Inc.*, 492 U.S. at 243–44 ("[Continuous] associations include, but extend well beyond, those traditionally grouped under the phrase 'organized crime.' . . . [T]he argument for reading an organized crime limitation into RICO's pattern concept, whatever the merits and demerits of such a limitation as an initial legislative matter, finds no support in the Act's text and is at odds with the tenor of its legislative history.").

Throughout its opinion, the District Court raised equitable or logistical concerns. Because these concerns are either endemic to RICO prosecutions or involve the application of irrelevant legal standards, it was improper for the Court to dismiss the indictment for any of these reasons.

On several occasions, the District Court alludes to RICO's broad scope and the potential for the law to be misapplied so as to unfairly try and punish common criminals and conspirators who were not the original targets of the law.[16] If we were writing on a blank slate circa 1971, the District Court's concerns might carry the day. In the forty years since RICO was enacted, however, much has been written on the proverbial slate. The Supreme Court has unwaveringly disagreed with the District Court's sincere

---

[16] *See, e.g.*, *Bergrin*, 707 F. Supp. 2d at 511 ("[T]he Government admitted that the acts would be prejudicially joined under Rule 14(a). . . . These admissions speak volumes as to the disparate nature of the substantive crimes that, in effect, also serve as the racketeering predicates. While the Government maintains that these wide-ranging crimes nonetheless fall within the ambit of a RICO pattern, to hold as much would be to condone the precise type of overreaching that courts and commentators have warned against since the enactment of RICO."); *Id.* at 516 n.15 (finding that if "the common purpose of the enterprise is to break the law and the course of conduct is committing illegal acts . . . . [RICO] would convert any garden variety criminal conspiracy into a RICO enterprise, which would be true neither to the letter nor the spirit of the RICO statute").

policy concern and we must do likewise. As we have noted, the Supreme Court has repeatedly reaffirmed that RICO is a powerful weapon that significantly alters the way trials are conducted in cases that involve racketeering acts committed by members of an enterprise. Most recently, the Court in *Boyle* stated:

> Because the statutory language is clear, there is no need to reach petitioner's remaining arguments based on statutory purpose, legislative history, or the rule of lenity. In prior cases, we have rejected similar arguments in favor of the clear but expansive text of the statute. See *National Organization for Women*, 510 U.S., at 262, 114 S.Ct. 798 ("The fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth" (quoting *Sedima*, 473 U.S. at 499, 105 S.Ct. 3275, brackets and internal quotation marks omitted)); see also *Turkette*, 452 U.S. at 589-591, 101 S.Ct. 2524. "We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe." *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. ----, ----, 128 S.Ct. 2131, 2145, 170 L.Ed.2d 1012 (2008).

129 S. Ct. at 2246–47. During oral argument in *Boyle*, the petitioner argued that too broad a reading of RICO amounts to "overreaching" because it results in a conflation of conspiracy and enterprise: "[C]onspirators are liable for the acts of their co-conspirators, which is the Pinkerton doctrine

34

which collapses 1962(c) into a general conspiracy statute, if you are going to define an enterprise principally by virtue of its common purpose." Oral Argument at 58:13, *Boyle v. United States*, 129 S.Ct. 2237 (No. 07-1309), *available at* http://www.oyez.org/cases/2000-2009/2008/2008_07_1309/argument. The Supreme Court, in keeping with its broad understanding of RICO, brushed this concern aside. *Boyle*, 129 S. Ct. at 2246 ("Under § 371, a conspiracy is an inchoate crime that may be completed in the brief period needed for the formation of the agreement and the commission of a single overt act in furtherance of the conspiracy. Section 1962(c) demands much more: the creation of an enterprise'-a group with a common purpose and course of conduct-and the actual commission of a pattern of predicate offenses." (citation omitted)). In the final analysis, irrespective of any logical or theoretical appeal to the District Court's concerns, they have been soundly rejected by the Supreme Court.

The District Court also was concerned about the difficulties of managing a complex multi-defendant, multi-count criminal trial.[17] Again, although this is an

---

[17] *Bergrin*, 707 F. Supp. 2d at 511 n.10 ("The differences between these RICO predicates are not merely a pleading concern. Thinking through the practicalities of trial, it concerns the Court that evidence of these different alleged criminal acts likely would pose evidentiary problems. . . . [T]he spillover prejudice from the introduction of each witness murder case [sic] in a trial of the other would give the Court serious pause. Beyond this, the Government would introduce its mortgage fraud case and prostitution cases during the same megatrial. The many and complex limiting

understandable concern for a trial judge, the fear that "complex limiting instructions . . . would confound the Court" is distinct from the question of whether an indictment alleges all of the elements of a crime.

Finally, the District Court analogized RICO to a more familiar legal framework by discussing how the various predicates would be analyzed under joinder and severance standards if they were tried as stand-alone offenses.[18] The Court again had a rational reason for discussing joinder and severance under Rules 8 and 14 of the Federal Rules of Criminal Procedure. The Government's indictment was somewhat unwieldy, charging all of the RICO and non-RICO

_____

instructions that would have to be employed as to the counts and defendants would confound the Court, let alone the jurors.").

[18] *See, e.g.*, *Bergrin*, 707 F. Supp. 2d at 510–11 ("There is little on the face of the Indictment demonstrating relatedness among the varied white collar frauds and street crimes offered by the Government as RICO predicates. The Government even conceded as much during oral argument, admitting that these disparate acts could not be joined but for the allegation of a RICO enterprise. . . . [T]he Government admitted that the acts would be prejudicially joined under Rule 14(a). . . . These admissions speak volumes as to the disparate nature of the substantive crimes that, in effect, also serve as the racketeering predicates."); *Id.* at 516–17 ("[T]he predicate acts themselves are so disparate in type and method that the Government conceded that they could not be properly joined under Rule 8(b) absent a RICO count.").

defendants with all of the RICO counts and underlying substantive crimes. Faced with a handful of motions to sever, the Court needed to analyze these rules. The misstep that the Court made, however, is that it did not merely assess whether the RICO counts and defendants could be tried along with the non-RICO counts and defendants. Instead, it determined that the predicate crimes underlying the RICO counts could not all be joined in one trial without a RICO charge binding them together, and from that, it extrapolated that the predicates cannot establish a "pattern of racketeering activity." In this case, however, there was a RICO count, and the Supreme Court has interpreted "pattern" such that it requires only "relationship and continuity," broadly construed. *H.J., Inc.*, 492 U.S. at 239. There is no support in *H.J., Inc.* or elsewhere for the notion that the individual predicates crimes must all be joinable in one trial, and it was therefore improper for the District Court to consider such an inapplicable standard as part of its analysis of the alleged "pattern."[19]

### III

For all the foregoing reasons, we hold that the District Court erred in dismissing the RICO and RICO-based counts. Accordingly, we will reverse the judgment of the District

---

[19] *Cf. Eufrasio*, 935 F.2d at 567 ("Rule 8(b) . . . . permits joinder of defendants charged with participating in the same racketeering enterprise or conspiracy, even when different defendants are charged with different acts, so long as indictments indicate all the acts charged against each joined defendant . . . are charged as racketeering predicates or as acts undertaken in furtherance of, or in association with, a commonly charged RICO enterprise of conspiracy.").

Court and remand the case for further proceedings consistent with this opinion.