PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-4300/4552
_____

UNITED STATES OF AMERICA,
                                        Appellant

v.

PAUL W. BERGRIN
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 09-cr-369)
District Judge:  Hon. William J. Martini
_____

Argued
March 29, 2012

Before:  FUENTES, SMITH, and JORDAN, *Circuit Judges*.

(Filed:  June 15, 2012)
_____

Mark E. Coyne
Steven G. Sanders   [ARGUED]
Office of United States Attorney
970 Broad Street – Rm. 700
Newark, NJ   07102
       *Counsel for Appellant*

Lawrence S. Lustberg   [ARGUED]
Gibbons
One Gateway Center
Newark, NJ   07102
       *Counsel for Appellee*

―――――――――

OPINION OF THE COURT

―――――――――

JORDAN, *Circuit Judge*.

Paul Bergrin, a former federal prosecutor and prominent defense attorney, was indicted in the United States District Court for the District of New Jersey on numerous charges, including violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO").  Reasoning that the RICO charges were inappropriate in light of "the disparate nature of the substantive crimes that … serve[d] as the racketeering predicates," the District Court dismissed them. *United States v. Bergrin*, 707 F. Supp. 2d 503, 511 (D.N.J. 2010).  The government appealed that decision and we reversed, observing that the concerns of the District Court were "either endemic to RICO prosecutions or involve[d] the application of irrelevant legal standards."  *United States v. Bergrin*, 650 F.3d 257, 274 (3d Cir. 2011).

After remand, the government filed a 33-count second superseding indictment (the "Indictment") charging Bergrin with RICO violations, witness tampering, participating in a cocaine-trafficking conspiracy, and tax evasion. Two of the Indictment's witness-tampering counts charge Bergrin for his role in facilitating the murder of a man named Kemo McCray ("Kemo"),[1] who was to have been a witness against one of Bergrin's clients.[2] The District Court ordered those counts (the "Kemo Murder Counts") to be severed and tried first and separately from the rest of the crimes charged. At the ensuing trial, the Court precluded the government from introducing evidence of two other witness-murder plots to prove Bergrin's intent to have Kemo murdered, and the jury was ultimately unable to reach a verdict.

As soon as the jury was dismissed, the government, in anticipation of a retrial, asked whether the District Court would adhere to its earlier evidentiary rulings. "Absolutely," was the response, though the Court noted that the government would be permitted to try to "convince [the Court] otherwise." (Joint App. at 49.) The government now appeals those evidentiary rulings and also asks us to review an

---

[1] For ease of reference, we will refer to Mr. McCray by his first name, intending no undue familiarity or disrespect.

[2] Specifically, Count 12 charges Bergrin with conspiring to murder Kemo to prevent his testimony in violation of 18 U.S.C. § 1512(k), and Count 13 charges that Bergrin "knowingly and intentionally … counsel[ed], and induce[d] others to kill" Kemo with "malice aforethought and with intent to prevent" his testimony in violation of 18 U.S.C. § 1512(a)(1)(A). (Joint App. at 199.)

additional severance order that the Court entered.[3]  In addition, the government urges that the case be reassigned to a new judge, contending that a reasonable person would conclude that the District Court's impartiality might reasonably be questioned.

We will vacate the District Court's decision with respect to one of the challenged evidentiary rulings, and, because we will direct the Chief Judge of the District Court to reassign this matter, will leave the other issues presented to be considered afresh by the judge who will take up the case.

## I. Factual Background and Procedural History

### A. *Facts*

Centered around RICO counts that are substantially similar to the ones we held to be validly pleaded the last time this case was before us, *see Bergrin*, 650 F.3d at 261-63 (summarizing the RICO charges), the Indictment accuses Bergrin of misusing his law practice to traffic drugs, facilitate prostitution, tamper with witnesses, and evade taxes. Three different instances of witness tampering, all of which are alleged in the RICO violation charged in Count 1, are relevant to this appeal. Specifically, Bergrin is charged with

---

[3] After the government took its appeal with respect to the evidentiary decisions pertaining to the Kemo Murder Counts, the Court severed the majority of the Indictment's remaining substantive counts and ordered that they be tried before the rest of the charges. The government appealed that ruling, too, *see infra* note 20, and we consolidated the government's two appeals for disposition.

instigating Kemo's murder, plotting to kill witnesses in connection with the legal defense of an individual named Vicente Esteves (the "Esteves Plot"), and plotting to kill a witness who planned to testify against a client named Richard Pozo (the "Pozo Plot").[4] Counts 2 through 4 of the Indictment also plead RICO violations relating to some or all of those three instances of witness tampering,[5] while the Indictment's remaining counts charge Bergrin with other substantive or conspiracy offenses that rest on many of the allegations set forth in the RICO counts.

1.    *The Kemo Murder*

---

[4] Although the three witness-tampering plots are all alleged in Count 1, only the Kemo murder and the Esteves Plot are charged as predicate racketeering acts. The Pozo Plot, by contrast, is listed as one of the "methods and means" through which Bergrin's firm engaged in racketeering.

[5] Count 2 charges Bergrin with participating in a RICO conspiracy and alleges that the Kemo murder, the Esteves Plot, and the Pozo Plot were overt acts in furtherance of the conspiracy. Counts 3 and 4 charge violent crimes in aid of racketeering offenses for Bergrin's involvement in the Kemo murder and the Esteves Plot, respectively. *See* 18 U.S.C. § 1959(a) (providing for criminal sanction where "[one] murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do" in connection with a racketeering activity).

5

The Kemo Murder Counts were the subject of the trial that ultimately led to the present appeal, and, as charged, they carry a mandatory life sentence.[6] *See* 18 U.S.C. § 1512(a)(3)(A) (tampering with a witness by killing is punishable as "provided in sections 1111 and 1112"); *id.* § 1512(k) ("Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."); *id.* § 1111(b) ("Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life.").

At the trial on those counts, the government introduced evidence that Kemo's murder arose out of Bergrin's representation of William Baskerville. Baskerville was an associate in a drug-trafficking organization run by Hakeem Curry and was arrested on federal drug charges in November 2003 for drug sales he made to Kemo. Baskerville told Bergrin that he suspected Kemo to be the likely source of the government's evidence against him. Bergrin, in turn, telephoned Curry and told him that Kemo was the confidential witness against Baskerville.

---

[6] The violent crimes in aid of racketeering offense pertaining to the Kemo murder, *see supra* note 5, also carries a mandatory life sentence, *see* 18 U.S.C. § 1959(a)(1) (violent crimes in aid of racketeering that result in murder are punished "by death or life imprisonment, or a fine …, or both"); *United States v. Carson*, 455 F.3d 336, 385 n.44 (D.C. Cir. 2006) (reaching the "common sense conclusion" that, despite the language employed, the violent crimes in aid of racketeering statute "does not permit a fine to be levied in lieu of imprisonment or death").

Anthony Young, a member of Curry's organization and the government's key witness at the trial of the Kemo Murder Counts,[7] was with Curry during that conversation and overheard Bergrin say that "Kamo" was the confidential witness against Baskerville. Young realized, however, that Bergrin was referring to Kemo. According to Young, Bergrin met with him and other Curry organization members approximately one week after Baskerville's arrest. At that meeting, Bergrin told the group that "if Kemo testif[ied] against [Baskerville], [Baskerville] w[ould] never see the streets again" (Joint App. at 2528), but that he could "get [Baskerville] out if Kemo d[id]n't testify" (*id.* at 2529). Bergrin twice reiterated "No Kemo, no case" and emphasized that the group should not "let that kid testify against [Baskerville]." (*Id.*)

Members of Curry's organization thereafter discussed how to find and kill Kemo, and, in March of 2004, Young found Kemo and shot him to death.

---

[7] Young was not the only witness who offered testimony incriminating Bergrin in Kemo's murder. Alberto Castro, a drug dealer, testified that Bergrin offered him $10,000 to murder Kemo, and two former confidants of Bergrin's testified that Bergrin implied his complicity in the events that led to Kemo's death. (*See* Joint App. at 3409 (testimony that Bergrin expressed his worry that "Baskerville would implicate him in the Kemo case"); *id.* at 3781 (testimony that Bergrin stated he had "met with Baskerville's people at the office," "told them the name of the [witness]," and that they had "killed [the witness] three months later").)

## 2. *The Other Murder Plots*

The government also sought to prove Kemo's murder using evidence of the Pozo Plot and the Esteves Plot, which the District Court ultimately precluded after considering evidentiary proffers.

The government's first effort to rely on those other murder plots developed pretrial when, after we ruled that the RICO counts had been wrongly dismissed and remanded the case, Bergrin filed a motion under Federal Rule of Criminal Procedure 14 to sever the Kemo Murder Counts from the Indictment.[8] Bergrin argued that a trial on every offense in the Indictment would be unfairly prejudicial. The government disagreed, contending that severing the Kemo Murder Counts "would be a waste of judicial resources, … would present increased danger for witnesses, and that regardless of the severance plan … all or most of the evidence of the related crimes would be admissible at … [any] of the severed trials." (*Id.* at 57-58.) It proffered, in that regard, that it would seek to prove the Kemo Murder Counts in part by relying on evidence of the Pozo Plot and the Esteves Plot under Federal Rule of Evidence 404(b).[9]

---

[8] We refer to the Federal Rules of Criminal Procedure simply as "Criminal Rules." Criminal Rule 14(a) provides that a "court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" when joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a).

[9] We refer to the Federal Rules of Evidence simply as "Rules." Rule 404(b), as we discuss further *infra*, provides

i.    *The Pozo Plot*

Pozo, the government asserted, was a "large scale drug trafficker who distributed multi-hundred kilogram shipments of cocaine he received in New Jersey via Texas." (D.N.J. ECF no. 09-369, doc. no. 304-1, at 13.)[10]  In February 2004, he was charged in the Western District of Texas for his role in that drug distribution scheme, and he hired Bergrin to represent him.  Bergrin determined that Pozo's co-defendant, Pedro Ramos, was cooperating with the government against Pozo.  He told Pozo that Ramos was an informant, asked him if he knew where Ramos lived, and told him that, if "we could get to [Ramos] and take him out, Pozo's headache (his drug charges) would go away." (D.N.J. ECF no. 09-369, doc. no. 302,  at 1 (internal quotation marks omitted).)  Pozo responded, "Are you nuts?  I am not involved in murdering people," and later retained new counsel.  (*Id.* (internal quotation marks omitted).)

ii.    *The Esteves Plot*

---

that although "[e]vidence of a crime, wrong, or other act" is inadmissible to prove a person acted "in accordance with [his or her] character," Fed. R. Evid. 404(b)(1), it may be admitted for "another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid. 404(b)(2).

[10] Our references to documents on the District Court's docket cite to the pagination contained in the ECF-generated header on each page.

9

Esteves, too, was a former client of Bergrin's who "operated a large scale drug trafficking business based in New Jersey." (D.N.J. ECF no. 09-369, doc. no. 304-1, at 23.) He was prepared to testify that, when he met with Bergrin in May 2008, after being charged in the Superior Court of New Jersey with drug trafficking, Bergrin told him that "the only way to beat the case was if [Esteves] took care of the witnesses" on a list of those Bergrin believed were cooperating with the government. (*Id.*) During that conversation, Bergrin also told Esteves that he "hate[d] rats and … would kill a rat himself," that "this was not the first time he ha[d] done this," and that, "if there are no witnesses, there is no case." (*Id.*) An informant named Oscar Cordova, whom Bergrin believed was a hitman, subsequently recorded Bergrin instructing him to kill a witness on that list. (*Id.*; *see* Joint App. at 225-28 (describing the plot).) In that conversation, Bergrin stated, "we gotta make it look like a robbery. It cannot under any circumstances look like a hit. … We have to make it look like a home invasion robbery." (D.N.J. ECF no. 09-369, doc. no. 304-5, at 3.)

B. *Procedural History*

1. *The First Severance*

In a September 21, 2011 opinion (the "First Severance Opinion") citing those proffers, the District Court decided that severance was necessary and ordered that the Kemo Murder Counts be tried first.

The Court did say, however, that it would "likely allow certain … Rule 404(b) evidence into the separate trial on the [Kemo Murder] Counts." (Joint App. at 58.) In particular, it

10

indicated that evidence of the Pozo Plot would be admissible because that plot occurred "before or around the same time as the [Kemo] murder conspiracy." (*Id.* at 59.) Evidence of the Esteves Plot, by contrast, troubled the Court. The Esteves Plot was unlike the "other-crime evidence most typically admitted under Rule 404(b)," the Court said, because it pertained to acts that "happened more than four years after the [Kemo] murder conspiracy" and was therefore evidence of a "*subsequent* criminal act." (*Id.*) Although the Court acknowledged that there was no categorical "bar to subsequent act evidence," it observed that "evidence of a subsequent act" is not necessarily "permissible or relevant in the same way that evidence of a prior bad act may be." (*Id.*)

Nevertheless, the Court seemed to take for granted that the government would be permitted to use Bergrin's own admissions to Esteves in proving the Kemo Murder Counts. (*See id.* at 62 (suggesting that certain evidence pertaining to the Esteves Plot would "likely be admissible to provide the requisite background information to support" the testimony of the witnesses, including Esteves, who would testify to Bergrin's admissions).) Aside from that, however, the Court made it clear that most of the proffered evidence pertaining to the Esteves Plot would be inadmissible in a trial on the Kemo Murder Counts. The Court was particularly concerned about the tape recording of Bergrin's conversation with Cordova, evidently believing that the tape's probative value was likely to be substantially outweighed by the danger of unfair prejudice:

> The Government proffers that it will introduce evidence, including audio recordings, showing that in 2008 Bergrin had conversations with a

11

confidential informant – dubbed by the Government as "the Hitman" – during which Bergrin explicitly discussed killing [a witness] and instructed the Hitman to make the murder look like a home invasion robbery. By contrast, the Government's proffered evidence regarding the [Kemo] murder is much more circumstantial. The Government intends to prove that Bergrin said the words "no Kemo, no case" to certain other persons and that by uttering these words Bergrin specifically intended to cause those individuals to murder [Kemo] to keep him from testifying. And although the Government has a variety of evidence specifically probative of the [Kemo Murder] Counts it intends to introduce, the evidence will likely be nowhere near as overwhelming as the evidence relating to the [Esteves Plot].

….

[I]n considering Bergrin's guilt for the [Kemo Murder] Counts, any limiting instructions would likely be insufficient. It would be perhaps unavoidable – and merely human – for the jury to use the direct, explicit evidence from the [Esteves Plot] murder conspiracy case to infer Bergrin's guilt of the [Kemo Murder] Counts regardless of any limiting instruction.

(*Id.* at 56.) Because Bergrin faced a life sentence on the Kemo Murder Counts, the Court found that risk to be particularly unacceptable. (*See id.* at 57 ("[A]lthough he is charged with a variety of crimes, the stakes on the [Kemo Murder] Counts are especially high for Bergrin: if a jury finds him guilty on those counts, he faces a mandatory life sentence.").)

Thus, based in part on its view that evidence of the other witness-murder plots would not, despite the government's argument, necessarily be admissible in a trial on the Kemo Murder Counts, the Court severed those counts from the Indictment and ordered them to be tried first.

2.  *The Government's Motion to Admit Rule 404(b) Evidence and the District Court's Initial Ruling*

On September 29, 2011, the government moved to admit much of the Rule 404(b) evidence it had set forth in its prior proffer, asking the Court to make "preliminary, pretrial rulings on the admissibility of [the] other acts evidence" that the Court's First Severance Opinion had suggested would be admissible in a trial on the Kemo Murder Counts. (D.N.J. ECF no. 09-369, doc. no. 304-2, at 3.) Among other things, the government sought admission of Pozo's testimony about the Pozo Plot, and Esteves's testimony as to Bergrin's statements during the Esteves Plot.[11] At an October 7, 2011

_____

[11] Although the government implied that it was not asking to introduce Bergrin's recorded statement to Cordova because of the Court's ruling in the First Severance Opinion, the government noted that "Bergrin's defense strategy

13

hearing four days before jury selection was scheduled to begin, the government followed up on the status of its Rule 404(b) motion, "requesting that the Court make at least some preliminary rulings … certainly before the jury is sworn."[12] (Joint App. at 584-85.)  The Court did not do so, however, and a jury was empaneled on October 13, 2011.

The next day, the Court announced its ruling on the government's motion which was memorialized in an undated and unfiled opinion "handed to the parties the following week."[13]  (D.N.J. ECF no. 09-369, doc. no. 304, at 7.) Highlighting the factual similarities between the Pozo Plot and the Kemo murder, the Court ruled that the government would be permitted to introduce Pozo's testimony under Rule 404(b):

---

[would] likely … open the door to additional Rule 404(b) evidence."  (D.N.J. ECF no. 09-369, doc. no. 304-2, at 3.)

[12] As the government explained to the Court, such a ruling would permit it to "properly prepare an opening statement" and "properly prepare [witnesses] so that they don't say something that's inadmissible." (Joint App. at 584-85.)  What was unsaid but perhaps implicit was that the swearing in of a jury would cut off the government's right under 18 U.S.C. § 3731 to an immediate appeal of an adverse evidentiary ruling.

[13] Although it was attached as an exhibit to a motion for reconsideration the government subsequently filed, the Court's Rule 404(b) opinion remains unfiled on the District Court's docket.

14

[E]vidence of the [Pozo Plot] … is admissible under Rule 404(b). The Government seeks to admit evidence that around February 2004, while Bergrin was acting as [Pozo's] lawyer in a drug-trafficking case in federal court, Bergrin provided [Pozo] with the identity of a government witness against him, and counseled [Pozo] that if the witnesses were killed, Bergrin would win [Pozo's] case. The factual similarities of this case are so striking, and it is so close in time – occurring contemporaneously with the [Kemo] murder conspiracy – that this evidence is highly probative of Bergrin's intent with respect to the charged conduct. And while it carries a risk of undue prejudice, that prejudice is insufficient to substantially outweigh its high probative value. And the Court will, again, mitigate the risk of prejudice by providing a proper limiting instruction.

(Joint App. at 10 (internal citations omitted).)

The Court, however, retreated from its previous suggestion that it would allow the government to introduce some of the evidence pertaining to the Esteves Plot. It ruled instead that no such evidence – including the "admissions themselves" – would be allowed "under Rule 404(b) because the potential for prejudice far outweigh[ed that evidence's] minimal probative value." (*Id.* at 13.) As the Court explained it, the admissions were minimally probative because they were made in connection with a subsequent, as opposed to a prior, crime and were therefore too attenuated from the Kemo murder:

15

In its [First Severance Opinion], this Court expressed at length its concerns regarding the minimal probative value of – and the undue risk of prejudice pose[d] by – this subsequent crime evidence. And while the Court previously indicated its willingness to consider allowing a limited amount of evidence to provide the necessary context as to these admissions, this no longer seems appropriate now that the Court has a better understanding of those admissions. The admissions that Bergrin allegedly made are too vague to be of great probative value – indeed, Bergrin does not mention the [Kemo] murder specifically, but alludes in general terms to some past act of indeterminate nature. And they, like the other evidence of the [Esteves Plot] … are potentially unduly prejudicial. If the admissions were admitted, the Government would also be entitled to introduce additional evidence regarding the [Esteves Plot], thereby compounding the risk of prejudice. And, as discussed previously, the potential prejudice of evidence regarding the murder conspiracy with Estevez [sic] is so great that it threatens to prevent the jury from making a proper determination of Bergrin's guilt for the [Kemo] murder – an untenable result, in light of this Court's previous rulings.

(*Id.* (internal citation omitted).)

### 3. *Bergrin's Opening Statement*

16

Opening statements began on October 17, 2011. Proceeding pro se with standby counsel, Bergrin told the jury that the evidence would prove he "never wanted, … never expected, …never believed … that one hair on Kemo's head would be hurt." (*Id.* at 648.) Instead, as he explained to the jury, he had simply acted as a zealous advocate on Baskerville's behalf: "[W]hen I represented – was called … to represent William Baskerville, who was accused of a criminal offense, the Sixth Amendment of the United States Constitution said that I had to represent him, that he deserved to be represented effectively. And that's all I ever did in this case." (*Id.*) Thus, although Bergrin acknowledged calling Curry and informing him that Kemo was the confidential witness, he characterized that call as part of his legal duty to represent Baskerville and denied any malicious motives.[14]

Bergrin spoke similarly in explaining the Pozo Plot to the jury, stating:

> Let me tell you about the facts of Richard Pozo which will come out in this case. Richard Pozo was dealing cocaine. He sent a car with a bunch of cocaine in it from Elizabeth, … where he was living, to Texas. The car began to be investigated. The car was dropped off in the driveway of somebody's house. While the car is being investigated, Richard

---

[14] Correspondingly, Bergrin claimed during the course of trial that he never participated in a meeting with Curry-organization members in which he allegedly implied that Kemo should be killed by saying, among other things, "No Kemo, no case."

Pozo comes to see me and says: I think I have a problem. I believe they detected cocaine in a car that I had sent to Texas. Will you represent me?

There is no informant involved. We have absolutely … no idea whatsoever who any informants are. The name Pedro Ramon doesn't even fit into the equation. We have no clue who the informant is, he has no clue who any informant is. And I question him in front of Peter Willis and another outstanding attorney by the name of John Whipple in Texas, and that's borne out here in this particular case. I never say to [Pozo]: Let's get rid of the informant. Because what does it matter? It doesn't matter. I would never say that because it has no impact, has no effect and I would never say that to this type of individual.

(*Id.* at 691-92.)

Believing that Bergrin had made "various door-opening assertions during his opening statement" the government filed a letter-motion the next day, asking the District Court to reconsider its evidentiary ruling excluding the Esteves Plot evidence.[15] (D.N.J. ECF no. 09-369, doc. no. 263, at 1.) The Court declined.

---

[15] More specifically, the government argued that Bergrin "exploited [the] Court's [evidentiary] rulings, and abused his status as a *pro se* litigant, by testifying in his opening statement." (D.N.J. ECF no. 09-369, doc. no. 263, at

### 4. *The District Court's Decision to Exclude Evidence of the Pozo Plot*

Worse yet for the government, on November 8, 2011, the Court reversed course on the admissibility of Pozo's testimony. Acknowledging that it had previously "indicate[d] that that testimony would be admissible under [Rule] 404(b)," the Court said it had changed its mind, "after hearing the case and the context in which [the testimony was] now being offered." (Joint App. at 19.) The Court described a three-step process for considering whether to admit evidence under Rule 404(b): first, to "decide whether there is sufficient evidence that the other act in question actually occurred"; second, to assess "whether the evidence of other acts is probative of the material issue other than character"; and third, to consider "whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect." (*Id.*)

Pozo's testimony, the Court said, was problematic under the first step of that procedure, because there was no independent documentation corroborating the substance of his intended testimony:

---

2.) And because it believed that Bergrin had brought his intent into question, the government asked the Court to allow it to introduce, among other things, Esteves's testimony so as to rebut Bergrin's "blanket, self-serving assertion" that he would never say "[l]et's get rid of the informant … to … a client facing charges because of a cooperating witness." (*Id.* at 5 (alteration in original) (internal quotation marks omitted).)

19

The first step is very rarely even an issue. … [It] is almost typically a prior conviction. It will be evidence of even a prior arrest which has some independen[t] corroboration because police make a prior arrest and then they seek to offer that type of evidence. It might even be a wiretap.

….

One of the concerns I have, and I've had, is that we're talking about conversations which allegedly occurred many years ago, and we're talking about people's best recollections of that conversation without it having been recorded, without it having been documented immediately.

….

We have that in this case already. We have this case, one of the biggest contentions in this case is if the statement "No Kemo, no case" was made, what exactly does that mean.

And the conversation with Mr. Pozo, I know the Government will say that's Mr. Pozo's best recollection. But there's nothing to document – when we're talking about parsing such important words, there's nothing to document what actually was spoken at that time in those few little sentences that the Government contends would show that Mr.

20

Bergrin was attempting [to] … you know, to murder the witness.

(*Id.* at 19-21.)

The Court suggested that its concern about whether Pozo's testimony was truthful also played a role in assessing whether, under the third step, the probative value of the evidence was substantially outweighed by "its potential prejudicial effect." (*Id.* at 19.) And the Court declared Pozo's testimony would be "cumulative," "collateral," and "confusing." It explained:

> I have no sense of confidence that this evidence would be so reliable that its probative value would outweigh its prejudicial effect. And I think, you know, there's a concern that it would be considered by this jury as propensity versus really going to intent.

> Now, in that context, let me also say, one of the considerations is, is there other evidence of intent in this case?

> And, you know, you have other evidence, so this would be cumulative and very collateral and very confusing, in this Court's opinion.

> ….

> [Y]ou have evidence of intent, you have, if the jury believes Mr. Young, you have the

21

conversation that Mr. Young testified to …, which is a very specific conversation that he says he recalls Mr. Bergrin making at that time back in 2004, shortly after … Mr. Baskerville's arrest. He testified at … some length about that conversation. So you have evidence of what "No Kemo, no case" means.

You also have the evidence that you brought forth about Mr. Castro. You brought forth evidence that Mr. Bergrin went to … another motivated witness, … which the jury will have to consider in which he says, Mr. Bergrin went to him at some point and said, you know: I'll give you $10,000 if you would, you know, kill this guy.

Mr. Pozo would be another witness, a drug dealer who is claiming at some point some conversation occurred. It's not documented. And in weighing the factors that I need to weigh as far as, you know, the minimum degree it will have with respect to intent, because the jury would have to parse those words, whatever they finally conclude were the words, first of all, because there's nothing to document other than Mr. Pozo saying what he remembers, and then on cross it may come out to … be something else, they'd have to document those – they'd have to parse those words along with the "No Kemo, no case." And I think their challenge as far as dealing with "No Kemo, no case" is enough.

22

(*Id.* at 23-26.)

That evening, the government filed a motion asking the Court to reconsider its decision to exclude evidence of the Pozo Plot and the Esteves Plot. As the government argued the next morning in support of its motion, one might perceive "an inherent tension" between the ruling that the Pozo Plot was based on "insufficient proof … because we don't have a tape" and the ruling that the Esteves Plot was too prejudicial "because we do have a tape." (*Id.* at 36, 37.) The District Court was not persuaded, however, and reaffirmed its rulings.[16]

5.      *Closing Arguments and the Jury's Verdict*

At a subsequent conference about jury instructions, Bergrin successfully requested that the jury be told it "is a defense to the charges in the Indictment that the defendant's acts constituted lawful and legitimate legal representation of a client." (D.N.J. ECF doc. no. 09-369, no. 327, at 46; *see* Joint App. at 4024-25 (Bergrin's request).) Then, in summation, he

---

[16] As to the Esteves Plot, the Court stated that if "there was a conviction [in Bergrin's case], I would believe … that that conviction was the result of the Esteves evidence, because I don't see how [the jury] could humanly put that out of their mind." (Joint App. at 38.) As to the Pozo Plot, the Court again laid out its fear that "the jury would … have to parse out what exactly did Mr. Bergrin say … according to Mr. Pozo's recollections eight months after the incident" given that "we're talking about a drug dealer, and hearing words that he thought." (*Id.* at 39.)

echoed his opening statement's assertion that he was being "accused for doing [his] job," to "defend the Constitution [by] mak[ing] sure that [Baskerville] ha[d] effective representation." (Joint App. at 4188.) Indeed, while Bergrin again acknowledged that he had discussed Kemo's name with Baskerville and disclosed it to Curry over the phone, he attributed his behavior to legitimate representation, and implored the jury not to conclude "under any circumstance, under any leap of bound and faith that [he] ever intended for one hair to be hurt on poor Kemo's head." (*Id.* at 4277; *accord id.* at 4194 ("I, under no circumstances, ever intended, ever wanted, ever told, ever warned, ever advised, ever informed anyone to ever harm a hair on the head of Kemo McCray. I never had that intent.").)

After six days of deliberation, the jury was unable to reach a verdict. As a result, the Court declared a mistrial on November 23, 2011, and scheduled a retrial on the Kemo Murder Counts for January 2012.

6.      *The Government's Appeal and Efforts to Determine Which Counts to Try Next*

Shortly thereafter, the government inquired "about rulings that [the Court] made excluding evidence," asking the Court to clarify if it was "going to adhere to those; Pozo and Esteves and the things that were contained in the … 404(b) ruling." (*Id.* at 49.) The Court responded as follows: "Absolutely. I don't see – unless you can convince me otherwise, as to why those rulings – I know you feel otherwise – but on reflection I feel strongly that those rulings were appropriate. So I don't expect I would be changing those rulings." (*Id.* at 49-50.) On November 30, 2011, the

24

government filed a notice of appeal challenging those evidentiary rulings.[17]

The next day, the government moved to try the remainder of the counts in the Indictment at the January 2012 retrial, though it stated it would be willing to sever the tax evasion counts upon Bergrin's request. The Court held a hearing on December 8, 2011 to consider which counts to try next. Bergrin appeared at the hearing and asked the Court to stay proceedings pending our disposition of the government's appeal of the evidentiary rulings. After consulting with the government, the Court suggested a second severance in which the drug-trafficking counts and the witness-tampering counts pertaining to the Esteves Plot would be severed and tried before the rest of the Indictment.[18] The government declined the Court's suggestion, however, prompting Bergrin to file a severance motion.

At an ensuing hearing on December 14, 2011, the government again requested that it be permitted to try the

---

[17] As discussed *infra* in Part II.A, the government invoked 18 U.S.C. § 3731 as the basis for appellate jurisdiction.

[18] Under that proposal, Count 5 of the Indictment – which charges a drug-trafficking conspiracy and lists the Kemo murder, the Pozo Plot, and the Esteves Plot as part of the conspiracy's "manner and means" – would have been altered to delete allegations relating to the Kemo murder so that "the Government [would be precluded] from introducing any such evidence." (D.N.J. ECF no. 09-369, doc. no. 352, at 1.)

entirety of its case against Bergrin, because "[t]he Kemo murder and the Esteves thing [were] not [disconnected] bookends" but rather were charged as "a racketeering RICO violation because" that was what they were. (*Id.* at 4436.) The Court, however, made clear that it would not accept the government's request to "go forward with the Kemo allegations … in the" RICO counts:

> The concern I always had and the reason I severed out [the Kemo Murder Counts] was because of what I believed, and still do believe – and I think, frankly, the result of the jury being hung reflects what I had a concern about – is that charge, standing alone, for the reasons I stated in the severance, I always was concerned about the prejudice there would have been if [it] would have been tried with Esteves and all of the drug evidence that occurred subsequently. And I still feel the jury wouldn't have been able to separate that out and decide the Kemo case just based on that case and the prior crime evidence that this Court didn't let in.

(*Id.* at 4433.) Trying the RICO counts next, the Court said, would unfairly expose Bergrin to a potential life sentence:

> The Court: … [I]n my opinion it would have been inherently unfair to have him convicted under a RICO – the way that was framed for the murder case facing a life in prison sentence tried that way. That's how I felt and I still feel that way. And yet, you still feel insistent on that's a fair trial, he should be facing that kind of penalty on the Kemo part of

26

the case when you already now saw a jury come back and couldn't reach a verdict on that.

Sure, if you get all your other evidence in he'll get convicted on the Kemo murder part of the case and, you know, that's what you want.

[Government's Counsel]: Well, Judge –

The Court: And that's the way you want to do it, and that's what I have a real difference of opinion with.

[Government's Counsel]: I understand.

The Court: And the Government, you know, they can charge a ham sandwich. I know that; you know that.

So if you charge a RICO case on its face on the indictment, it doesn't take a whole lot to charge a RICO case.

(*Id.* at 4463-64.) Given that, in the Court's view, the government's case on the charges other than the Kemo Murder Counts and the related RICO counts was "very strong,"[19] that it could be proven without the witnesses who

---

[19] The Court opined that, aside from the Kemo Murder Counts, the government had a "very clean, strong case," with witnesses "more credible than Anthony Young and Castro type witnesses." (Joint App. at 4461.)

27

had testified in the trial on the Kemo Murder Counts, and that it would warrant a "sentence that would reflect the severity of [those other charges]," the Court suggested that the government should not "spend the taxpayers' money to come in here, put on [the Kemo Murder Counts] evidence again, [and] stand behind those kinds of witnesses again when [the government did not] have to do it." (*Id*. at 4460.)

In response to those concerns, the government invited the Court to dismiss the RICO counts if it believed "that Mr. Bergrin [could not] get a fair trial … as presently constituted." (*Id.* at 4458.) The Court, however, refused to dismiss the Indictment's RICO counts, stating that it had already "[done] that once … because at the time I still was concerned about the RICO allegations, quite frankly, mostly for the same reason." (*Id.*)

7.    *The Second Severance*

Instead, on December 27, 2011, the Court severed the substantive counts charging Bergrin with drug trafficking and participating in the Esteves Plot from the rest of the counts in the Indictment, and ordered that they be tried in January 2012 (the "Second Severance Order"). The Court explained that its "original premise [was] that trying Bergrin for his alleged involvement in the [Kemo] murder conspiracy with extensive evidence from the [Esteves Plot] … would be fundamentally unfair and improper" (*id.* at 67), and it went on to say that the concerns memorialized in its First Severance Opinion required an additional severance, because the government's appeal with respect to the Kemo Murder Counts made it "impossible" to pursue the "most logical solution" of simply retrying those counts (*id.* at 69).

28

Severing the Indictment's drug-trafficking and Esteves Plot counts was the next best solution, the Court said, since such a severance would

> avoid[] undue prejudice because Bergrin faces no exposure for his alleged involvement in the [Kemo] murder conspiracy, and so the jury cannot find him guilty of those charges based on improper spillover evidence. It also incorporates as many of the remaining counts as may properly be joined, and, if Bergrin is convicted, carries a substantial penalty which should satisfy the Government's desire for justice.

(*Id.* at 73.) The Court also ruled that it was necessary to ensure that those counts were tried before the RICO counts in which the Kemo murder and the Esteves Plot were intrinsic, rejecting the government's statement that it should be permitted to proceed on its RICO charges first, and characterizing that position as a "thinly veiled attempt to either circumvent [the Court's] prior decision or discourage the Court from taking further actions required by justice." (*Id.*)

That same day, the government filed a second notice of appeal, this time challenging the Second Severance Order.

## II.    Discussion

The government argues that the District Court abused its discretion by precluding the introduction of evidence of

the Pozo Plot and the Esteves Plot in the retrial on the Kemo Murder Counts, and in ordering the drug-trafficking and Esteves Plot counts to be severed. It also contends that this case should be reassigned to another district judge. Bergrin of course disagrees, but spends the bulk of his efforts arguing that we lack jurisdiction to entertain any of the government's arguments.

We begin by addressing the jurisdictional issue.

A.    *Jurisdiction*

The District Court had jurisdiction over this case under 18 U.S.C. § 3231. We, in turn, have appellate jurisdiction to consider challenges to "decision[s] or order[s] of a district court suppressing or excluding evidence …, not made after the defendant has been put in jeopardy," so long as the "United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." 18 U.S.C. § 3731. The government's appeal from the District Court's ruling excluding evidence of the Pozo Plot and the Esteves Plot invokes that jurisdiction on the ground that the District Court's verbal statement that it would "[a]bsolutely" adhere to its prior rulings on retrial (Joint App. at 49) was an appealable "decision or order" excluding evidence.

Given § 3731's express mandate that its provisions "shall be liberally construed to effectuate its purposes," 18 U.S.C. § 3731, there is wide agreement that oral decisions dealing with subjects within the statute's scope are appealable. *See United States v. Farnsworth*, 456 F.3d 394, 398-99 (3d Cir. 2006) (presuming an "oral ruling" is

30

appealable under § 3731, but holding the ruling at issue was not appealable because it was not, as the government contended, a dismissal); *United States v. Janati*, 374 F.3d 263, 269 (4th Cir. 2004) (exercising appellate jurisdiction over an "oral ruling"); *United States v. Presser*, 844 F.2d 1275, 1280 (6th Cir. 1988) ("[W]e view the district court's oral statement as evidencing an intent to exclude government evidence … and consequently, its statement qualifies as an appealable order … ."); *United States v. Flores*, 538 F.2d 939, 942-43 (2d Cir. 1976) (oral ruling "exclud[ing] evidence of prior acts and statements" was appealable under § 3731). Bergrin argues, however, that the District Court's statement was not sufficiently definite to constitute an appealable decision or order, because the District Court was not unequivocal in saying it would exclude evidence of the Pozo Plot and the Esteves Plot at Bergrin's retrial. *Cf. United States v. Brooks*, 145 F.3d 446, 453-54 (1st Cir. 1998) (stating that orders lacking a requisite "degree of finality … may not qualify as … order[s] excluding evidence under section 3731"). The record belies that claim.

Although the Court's colloquy did include some qualifying language, the first thing it said was that it would "[a]bsolutely" exclude that evidence from Bergrin's retrial. (Joint App. at 49.) And it further stated that it "fe[lt] strongly that [its] rulings were appropriate." (*Id.*) The Court's rulings over the course of Bergrin's trial on the Kemo Murder Counts reflect similarly strong convictions, even amidst repeated requests by the government to introduce the Pozo Plot and the Esteves Plot evidence after Bergrin denied any intent to harm Kemo. Moreover, the Court confirmed its resolve to keep out the questioned evidence when, at a hearing after the government's first appeal was filed, it reiterated that

31

excluding the evidence was "the right decision" (*id.* at 4446), and subsequently ordered a second severance based on its belief "that trying Bergrin for his alleged involvement in the [Kemo] murder conspiracy with extensive evidence from the [Esteves Plot] … would be fundamentally unfair and improper" (*id.* at 67).

The District Court did, to be sure, leave open the possibility that it would reconsider its evidentiary determinations, and it is possible, as Bergrin points out, that circumstances may change in the future. But the chance of change is inherent in virtually every pretrial evidentiary ruling and treating such rulings as unreviewable "would insulate [them] from appellate review, thus frustrating … the purposes of § 3731." *United States v. Siegel*, 536 F.3d 306, 315 (4th Cir. 2008). Indeed, even a district court's explicit suggestion that a ruling is "preliminary and could change" does not make it an unappealable one under § 3731. *Id.* at 314; *cf. United States v. Horwitz*, 622 F.2d 1101, 1104 (2d Cir. 1980) (stating that even "conditional … ruling[s], which raise[] the remote prospect that suppression will not be ordered, [do not] necessarily deprive[] [an appellate] court of jurisdiction under section 3731"). Thus, while there was perhaps some "ambiguity about the district court's future actions," its statement clearly "evidenc[ed] an intent to exclude government evidence" at Bergrin's retrial, *Presser*, 844 F.2d at 1280, and thereby laid the foundation for our jurisdiction under § 3731.

32

We turn, then, to consider the government's challenge to the merits of those evidentiary rulings.[20]

---

[20] Although we can undoubtedly review the District Court's second severance to determine whether it warrants mandamus relief, since the government has alternatively petitioned for that writ, *see United States v. Santtini*, 963 F.2d 585, 590 (3d Cir. 1992) ("[P]arties are free to proceed alternatively on application for a writ or by appeal, with the court determining which, if any, procedure is more appropriate."), the jurisdictional question presented by the appeal of the Second Severance Order is more difficult. The government argues that we have pendent appellate jurisdiction to consider that appeal based on our § 3731 jurisdiction to consider the District Court's evidentiary rulings. We have "recognized 'a discretionary, though 'narrow,' doctrine of pendent appellate jurisdiction,'" *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 204 (3d Cir. 2001) (citation omitted), but there is a split in authority as to whether that doctrine applies in criminal cases and we have not expressly employed it in that context, *compare, e.g.*, *United States v. Ferguson*, 246 F.3d 129, 138 (2d Cir. 2001) ("[T]here is no pendent appellate jurisdiction in criminal cases." (citing *Abney v. United States*, 431 U.S. 651, 662-63 (1977))), *with United States v. Lopez-Lukis*, 102 F.3d 1164, 1167 & n.10 (11th Cir. 1997) (exercising pendent appellate jurisdiction over an order striking a count from an indictment where the government appealed an order suppressing evidence under § 3731), *and United States v. Maker*, 751 F.2d 614, 626 (3d Cir. 1984) (reviewing a severance order for an abuse of discretion without explicitly relying on, or referring to, pendent appellate jurisdiction). Because we will require

B.  *The District Court's Exclusion of Pozo's Testimony*[21]

Before trial, the District Court had ruled that the government would be permitted under Rule 404(b) to introduce Pozo's testimony that Bergrin counseled him to murder a witness. As the Court noted at that time, "[t]he factual similarities" between that incident and the Kemo murder are "striking," and the "evidence is highly probative of Bergrin's intent with respect to [the Kemo murder]." (Joint App. at 10.) Although the Court thought the admission of that testimony "carrie[d] a risk of undue prejudice," it concluded "that [the] prejudice [was] insufficient to substantially outweigh its high probative value" and noted that it would "mitigate the risk of prejudice by providing a proper limiting instruction." (*Id.*) At trial, however, even after Bergrin told the jury in his opening statement that he would not have made the statements to which Pozo would testify and declared that he had been acting legitimately as an attorney in representing Baskerville, the Court turned about and ruled that the evidence was inadmissible. We agree with the government that the reasons given for that change reflect an abuse of discretion.

---

this case to be reassigned and will ask that the severance rulings be revisited, *see infra* Part II.C, we need not determine the propriety of the Second Severance Order and therefore do not decide whether we have appellate jurisdiction to review it.

[21] We review a "district court's decision regarding the admissibility of evidence … for abuse of discretion." *United States v. Higdon*, 638 F.3d 233, 238 (3d Cir. 2011).

Rule 404(b), as we have noted, provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that … the person acted in accordance with the character," Fed. R. Evid. 404(b)(1), but the Rule permits such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid. 404(b)(2). To be admissible under Rule 404(b), then, evidence of uncharged crimes or wrongs must have a proper evidentiary purpose. "A proper purpose is one that is 'probative of a material issue other than character.'" *United States v. Green*, 617 F.3d 233, 250 (3d Cir. 2010) (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)); *see United States v. Johnson*, 199 F.3d 123, 128 (3d Cir. 1999) (stating that Rule 404(b) evidence is proper "if relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime" (citation and internal quotation marks omitted)). As long as evidence offered under Rule 404(b) satisfies that criterion, we favor its admission. *Johnson*, 199 F.3d at 128. Of course, such evidence may be excluded if "its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. We have also emphasized that limiting instructions may be appropriate when admitting Rule 404(b) evidence. *See Green*, 617 F.3d at 249 (noting that a limiting instruction should be given where requested).

       1. *The Decision That There Was Insufficient Evidence to Establish That Pozo's Testimony Was Truthful*

35

As the District Court correctly explained, one step in evaluating whether to admit Rule 404(b) evidence is to determine whether there is sufficient evidence to conclude that the crime, wrong, or other act in question actually occurred, because "similar act evidence is relevant only if … the act occurred and … the defendant was the actor." *Huddleston*, 485 U.S. at 689.  Applying that inquiry to Pozo's proffered testimony, however, the Court made its own credibility assessment, saying that there was "nothing to document what actually was spoken at that time in those few little sentences that the Government contends would show that Mr. Bergrin was attempting [to] … you know, to murder the witness."  (Joint App. at 21.)  Owing to the lack of independent corroboration, the Court decided that "Mr. Pozo's best recollection" would not suffice.  (*Id.*)  That was an error of law.

In *Huddleston v. United States*, the Supreme Court expressly rejected the "level of judicial oversight" that the District Court applied here in excluding Pozo's testimony. 485 U.S. at 688.  It said, rather, that Rule 404(b) evidence need only be supported by sufficient evidence for a jury to be able to "reasonably conclude that the act occurred and that the defendant was the actor."  *Id.* at 689.  A court's task in that regard is simply to decide, in accordance with Rule 104(b), "whether the jury could reasonably find th[ose] facts … by a preponderance of the evidence."[22]  *Id.* at 690; *see* Fed. R.

---

[22] Thus, although the standard of proof in criminal cases requires a greater showing than a preponderance of proof, evidence of a contested fact may be admissible towards that greater burden when the "evidence in the case" permits a

Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). Importantly, the Supreme Court instructed that, in making that determination, trial courts must not "weigh[] credibility" or "make[] a finding." *Huddleston*, 485 U.S. at 690.

By discounting Pozo's testimony based on a lack of corroboration and questions about credibility, the Court usurped the jury's role. *See United States v. Dillon*, 532 F.3d 379, 391 (5th Cir. 2008) ("Rule 104(b) does not require corroboration. It only requires that the district court consider the witness's testimony and determine that a reasonable jury could [make the required] find[ing] by a preponderance of the evidence … ." (internal footnote omitted)); *Siegel*, 536 F.3d at 319 ("Evidence is [sufficiently] reliable for purposes of Rule 404(b) 'unless it is so preposterous that it could not be believed by a rational and properly instructed juror.'" (citation omitted)); *cf. United States v. Haut*, 107 F.3d 213, 220 (3d Cir. 1997) (noting that it "is a basic tenet of the jury system that it is improper for a district court to substitute[ ] [its] judgment of the facts and the credibility of the witnesses for that of the jury" (alteration in original) (citation and internal quotation marks omitted)). While Pozo's credibility and motivation for testifying may be open to question, his testimony itself was sufficient to permit a jury to reasonably conclude, by a preponderance of the evidence, that Bergrin did the things that Pozo said he did. *See United States v. Bailey*, 990 F.2d 119, 123 (4th Cir. 1993) (explaining that a witness's testimony should not be precluded "simply because

---

jury to "reasonably find the … fact … by a preponderance of the evidence." *Huddleston*, 485 U.S. at 690.

37

it is in conflict with or contradicted by other testimony" or is offered by a "witness [who] has an unsavory past," as those "are merely circumstances for the jury to consider").

Consequently, the Court was obliged to permit a jury to consider that testimony, provided it was otherwise admissible under the Federal Rules of Evidence.

> 2. *The Finding That Pozo's Testimony Was Substantially More Prejudicial Than Probative*

The District Court did not believe that Pozo's testimony was otherwise admissible, because, under Rule 403, the Court determined that the testimony was cumulative and confusing, and that the prejudice from it substantially outweighed any probative value. All of those conclusions are problematic.

To begin with, it is not clear that the Court applied the proper test under Rule 403, because, at times, it spoke simply in terms of "prejudice" to Bergrin. (Joint App. at 23.) It must always be remembered that *unfair* prejudice is what Rule 403 is meant to guard against, that is, prejudice "based on something *other* than [the evidence's] persuasive weight." *United States v. Cruz-Garcia*, 344 F.3d 951, 956 (9th Cir. 2003); *see United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) ("[U]nfair prejudice does not simply mean damage to the opponent's cause." (citation and internal quotation marks omitted)). Assuming the Court was using the term "prejudice" as shorthand for "unfair prejudice," we are examining the kind of balancing decision to which we would ordinarily accord great deference. *See United States v.*

*Kellogg*, 510 F.3d 188, 197 (3d Cir. 2007) (noting that if "judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal" (citation and internal quotation marks omitted)). In general, a Rule 403 decision will not be reversed unless the "analysis [undertaken] and resulting conclusion" is "arbitrary or irrational." *Id.* (citation and internal quotation marks omitted). Here, unfortunately, the District Court's Rule 403 analysis was arbitrary, in that it was based on the same legally flawed credibility determination that led the Court to conclude that Pozo's testimony was inadmissible without independent corroboration.

Pozo, as the District Court saw it, "would be another witness, a drug dealer who is claiming at some point some conversation occurred." (Joint App. at 25.) Assessing his proffered testimony in that light, the Court characterized it as having a "minimum degree [of persuasiveness] … with respect to intent." (*Id.*) An assumption about how the jury would view Pozo's credibility was, however, an improper basis for discounting his testimony's probative value. *See United States v. Welsh*, 774 F.2d 670, 672 (4th Cir. 1986) ("[A]s a general rule, the credibility of a witness has nothing to do with whether or not his testimony is probative with respect to the fact which it seeks to prove."); 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5214 (4th ed. 1996) ("[I]t seems relatively clear that in the weighing process under Rule 403 the judge cannot consider the credibility of witnesses."). And that errant starting point likewise tainted the Court's conclusion that the jury would be confused by Pozo's testimony indicating that Bergrin told him to "take out" a cooperating witness. The

39

only possible confusion, if it can be called that, would arise from discrediting the source of the testimony.[23]

Stripped of improper credibility assessments, Pozo's proffered testimony is – as the District Court initially observed when saying it would be admissible – highly probative of Bergrin's guilt, because the factual similarities between the Pozo Plot and the Kemo murder truly are "striking." (Joint App. at 10.) Pozo was a drug dealer represented by Bergrin around the same time as the Kemo murder, and he was prepared to testify that Bergrin suggested that he kill a witness. Pozo's testimony is, therefore, powerfully suggestive of Bergrin's intent in passing Kemo's identity on from Baskerville to Curry. It is likewise relevant to deciding whether Bergrin uttered the words "No Kemo, no case," and, if he did, what he meant.[24]

---

[23] Nor was the testimony, as the District Court suggested, cumulative. After all, the Court itself recognized that the credibility of the primary witnesses against Bergrin on the Kemo Murder Counts is open to question. *See supra* note 19. Pozo's testimony would therefore have added much "to the probative force of the other evidence in the case," and "contribut[ed] to the determination of truth," *United States v. Williams*, 81 F.3d 1434, 1443 (7th Cir. 1996), and so it cannot properly be said to be "cumulative," *United States v. Brown*, 597 F.3d 399, 406 (D.C. Cir. 2010) (stating evidence should only be deemed "cumulative" when the "evidence on one side is so full that no jury that rejected it would be likely to change its mind because of the introduction of the proffered evidence" (citation omitted)).

[24] The District Court itself recognized that intent was a key issue in the case in its colloquy excluding Pozo's

40

In sum, we conclude that the District Court's ruling excluding Pozo's testimony cannot "be reconciled with a sound exercise of discretion," *United States v. Gatto*, 924 F.2d 491, 501 (3d Cir. 1991), and, accordingly, must be vacated.[25]

testimony under Rule 403. (*See* Joint App. at 20-21 ("[O]ne of the biggest contentions in this case is if the statement 'No Kemo, no case' was made, what exactly does that mean.").) But Bergrin argues that his intent is not at issue with respect to the Kemo Murder Counts, because his primary defense is that he never attended the meeting in which he allegedly said "No Kemo, no case." We disagree. Bergrin's insistence that he did not say those words does not mean the jury will not have to consider them. It is for the jury to decide whether he said them. Moreover, as we have just noted, the question of Bergrin's intent is not only relevant to determining what "No Kemo, no case" may mean, but also to ascertaining Bergrin's purpose in telling Curry who the witness against Baskerville was.

[25] Pozo's proffered testimony was proper Rule 404(b) evidence, and, as we have made plain, our review of the record thus far reveals no sound basis upon which it should have been precluded from the government's case on the Kemo Murder Counts under Rule 403. We nevertheless leave it to the new judge to whom this case will be assigned to conduct his or her own balancing under Rule 403 if the government again seeks to prove the Kemo Murder Counts using evidence of the Pozo Plot.

With respect to the Esteves Plot, we agree with the government that the District Court observed an unwarranted

analytical distinction between a "prior bad act" and a "subsequent bad act," reasoning that the latter "looks more like evidence that is being offered to show that the accused is a 'bad guy,' someone with the propensity to commit criminal acts." (Joint App. at 60.) Rule 404(b) refers to evidence of crimes, wrongs, or other acts, saying nothing about whether the act in question is a "prior" or "subsequent" act. That makes sense because light can be shed on motive, intent, and the other issues listed in Rule 404(b)(2) as much by a subsequent course of behavior as it can by a prior one. *Cf. Huddleston*, 485 U.S. at 686 (referring to "*similar acts evidence* under Rule 404(b)" (emphasis added)). So although we once questioned, in dicta "[t]he logic of showing prior intent or knowledge by proof of subsequent activity," *United States v. Boyd*, 595 F.2d 120, 126 (3d Cir. 1978), the District Court erred to the extent it dismissed the probative value of subsequent act evidence. *See United States v. McGilberry*, 620 F.3d 880, 886 (8th Cir. 2010) ("Rule 404(b) draw[s] no distinction between prior and subsequent acts that would support different analyses … ." (citation and internal quotation marks omitted)); *United States v. Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007) ("The courts of appeals mostly agree that the admission of subsequent acts under Rule 404(b) is governed by the same four-part test as prior acts … ."); *United States v. Mohr*, 318 F.3d 613, 617 (4th Cir. 2003) ("Rule 404(b) … covers evidence of both prior and subsequent acts."); *United States v. Jernigan*, 341 F.3d 1273, 1283 (11th Cir. 2003) ("[T]he standard for evaluating the admissibility of a subsequent bad act under Rule 404(b) is identical to that for determining whether a prior bad act should be admitted under this Rule."); *United States v. Echeverri*, 854 F.2d 638, 645 (3d Cir. 1988) ("We do not

dispute that there may be cases in which evidence of subsequent wrongful acts may properly be admitted under Rule 404(b)"); *United States v. Alker*, 260 F.2d 135, 157 (3d Cir. 1958) (stating that "prior and subsequent acts … substantially similar to the subject matter forming the basis of the indictment [that] are probative to negate the inference that the crucial conduct was … innocent").

Unlike the District Court's ruling with respect to the Pozo Plot, however, the District Court's decision to exclude evidence of the Esteves Plot was not clearly rooted in a flawed premise. Indeed, the Court spoke at length about its concerns regarding the nature of the Esteves Plot evidence, (*see, e.g.*, Joint App. at 38 (explaining that if "there was a conviction, I would believe … that that conviction was the result of the Esteves evidence, because I don't see how they could humanly put that out of their mind and the purposes of the cautionary instruction would be and then weigh the rest of this case accordingly")), and we cannot glean whether or not its Rule 403 balancing was tainted by the mistaken distinction it drew between subsequent and prior acts. Thus, it is difficult to tell whether or not the Court's judgment is entitled to the deference ordinarily accorded a Rule 403 decision. *See Kellogg*, 510 F.3d at 197 (stating the general maxim that "judicial self-restraint" is desirable "when a Rule 403 analysis of a trial court is reviewed" (citation and internal quotation marks omitted)). However, because we will be reassigning this case and directing the new district judge to determine afresh the admissibility of the Esteves Plot evidence, *see infra* Part II.C, we need not tackle the issue at this juncture. It suffices to say that, in considering that issue on remand, the judge should bear in mind that subsequent act evidence may be properly admitted under Rule 404(b), although Rule 403

C.  *Reassignment*

The government also asks that this case be given to another district judge, and we agree, reluctantly, that reassignment is appropriate.  Our authority to direct the reassignment of a case on remand is based on 28 U.S.C. § 455(a) and 28 U.S.C. § 2106.  *United States v. Bertoli*, 40 F.3d 1384, 1411 (3d Cir. 1994).  Under § 455(a), a judge should no longer preside over a case when "a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned."[26] *United States v. Wecht*, 484 F.3d 194, 213 (3d Cir. 2007) (citation and internal quotation marks omitted).  To warrant reassignment under § 455(a), a case generally must involve apparent bias deriving from an extrajudicial source,  meaning

---

permits exclusion when the probative value of such evidence is "substantially outweighed by a danger of … unfair prejudice," *see* Fed. R. Evid. 403, which, again, refers to prejudice "based on something *other* than [the evidence's] persuasive weight." *Cruz-Garcia*, 344 F.3d at 956.

All of this, of course, becomes essentially moot if the new judge disagrees with the approach to severance that had been followed here, though a limiting instruction might still be warranted with respect to the jury's consideration of the Pozo Plot and the Esteves Plot in connection with the Kemo Murder Counts.

[26] "[T]he hypothetical reasonable person … must be someone outside the judicial system because judicial insiders … may regard asserted conflicts to be more innocuous than an outsider would." *In re Kensington Int'l Ltd.*, 368 F.3d 289, 303 (3d Cir. 2004).

44

something above and beyond judicial rulings or opinions formed in presiding over the case. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) (noting that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion [under § 455(a)]" since they rarely "evidence the degree of favoritism or antagonism required … when no extrajudicial source is involved"). Our supervisory powers under § 2106, however, also permit reassignment and are not necessarily constrained by that limitation. *See id.* at 554 (noting that "[f]ederal appellate courts' ability to assign a case to a different judge on remand rests not on the recusal statutes alone, but on the appellate courts' statutory power" under § 2106 which "may permit a different standard" than that applicable to § 455(a)). Notwithstanding the potential differences between the standards for reassignment under § 455(a) and § 2106, we have typically reviewed requests for reassignment under § 2106 "under an 'appearance of impartiality' standard" like that applicable in the § 455(a) context. *Bertoli*, 40 F.3d at 1414 (citation omitted); *see Gov't of the V.I. v. Walker*, 261 F.3d 370, 376 (3d Cir. 2001) (exercising the supervisory power to reassign a case because the "conduct and comments of the trial judge … ma[d]e it exceedingly difficult to resurrect an appearance of impartiality").

Although reassignment is an extraordinary remedy that should seldom be employed, *see United States v. Higdon*, 638 F.3d 233, 248 (3d Cir. 2011) (recognizing that reassignment should "be considered seriously and made only rarely" (citation and internal quotation marks omitted)), we conclude that it is appropriate in this case despite our sincere respect for the District Judge who has presided to this point. Key to our decision is the District Court's repeated expressions of

45

discomfort with the manner in which the Indictment pulls the various criminal acts, including the witness-tampering plots, together under the umbrella of RICO charges. That discomfort manifested itself when the Court entered its first dismissal of the RICO counts. While the Court pointed to what may be called "equitable or logistical concerns," *Bergrin*, 650 F.3d at 274, in examining "the sufficiency of the [then-existing indictment's] allegations" under Criminal Rule 12, *Bergrin*, 707 F. Supp. 2d at 509, it was not explicit about how prominent a role those concerns played in its decision. It now appears that the Court ruled as it did, at least in part, because it believes that it is impossible for Bergrin to get a fair trial on the RICO counts due to the very nature of RICO, allowing, as it does, for multiple criminal acts to be charged as a pattern of racketeering activity.[27] (*See* Joint App. at 4458 (the Court's answer, in response to the government's invitation to dismiss the RICO counts if the Court believed they could not be fairly tried, that "I did that once … because at the time I still was concerned about the RICO allegations, quite frankly, mostly for the same reason").)

The Court expressed that same fear when, after the government appealed the evidentiary rulings relating to the Kemo Murder Counts, it balked at the government's request to try the RICO counts. In suggesting that a trial of those

---

[27] We recognize that the District Court's primary concern here was that Kemo's murder, for which Bergrin faces a potential life sentence, is an integral component of the Indictment's RICO counts. *See supra* note 6. We do not intend to suggest that, in different circumstances, there would be hostility to trying RICO counts simply because they allow the government to address multiple criminal acts in one charge.

46

counts would be a fundamentally unfair and inefficient use of prosecutorial resources, the Court said:

> And now you're sitting here saying: Judge, we want to do it that way. We're going to bring back these guys and we're going to spend all this taxpayers' money, all these people in witness protection, they're going to come flying in, coming in, we're going to go through all of this, when you have an option. You have an option of a five to seven-week trial, clean, probably a conviction if the evidence is what I see it is. I mean, you know, and yet you're insisting on trying to prove an enterprise, a pattern, all these predicate acts, confusing a jury, bringing in these guys again, and he'll be cross-examining them again. For what?

(*Id.* at 4461-62.)

To mitigate that perceived inequity, and in an apparent effort to dissuade the government from seeking to try the RICO counts, the Court tried to assure the government that "there would be a sentence that would reflect the severity of" the Indictment's other charges if it secured a conviction on those charges. (Joint App. at 4460.) In that same colloquy, the Court did not dispute the government's assertion that the Court had "all but accused [the prosecution of] having wrapped [the Kemo murder and the Esteves Plot] in the Indictment in order to prevent [Bergrin] from getting a fair trial" (*id.* at 4450), confirming instead that, in the Court's view, it would indeed "have been inherently unfair to have [Bergrin] convicted under … RICO" (*id.* at 4463). Most

47

recently, in ordering a second severance, the Court made clear its view that "trying Bergrin for his alleged involvement in the [Kemo] murder conspiracy with extensive evidence from the [Esteves Plot] … would be fundamentally unfair and improper." (*Id.* at 67.)

The problem with that view is that presenting the witness-tampering allegations as part of a related pattern of racketeering activity is exactly what the Indictment and RICO allow. The Indictment contains valid RICO charges which allege the Kemo murder along with the Esteves Plot and the Pozo Plot, and, if the government ever brings its RICO charges in this case to trial, it will necessarily introduce evidence of those murder plots to meet its burden of proof. We do not doubt the depth of the District Court's commitment to ensuring a fair trial for all parties, and the Court's concern for the rights of a criminal defendant is commendable. But, as we have already held, Congress validly paved a path for prosecutions like the one charged in the Indictment. *See Bergrin*, 650 F.3d at 276 (reversing the dismissal of substantially similar RICO counts). It is not a court's prerogative to construct a detour around RICO simply because the court is uncomfortable with how that statute may "significantly alter[] the way trials are conducted in cases that involve racketeering acts committed by members of an enterprise."[28] *Id.* at 275; *see United States v. Vitillo*, 490 F.3d

---

[28] We do not mean to imply that a district court is powerless in a RICO case to consider severance orders. On the contrary, as we said the first time we had this case, the District Court could appropriately "discuss[] joinder and severance under Rules 8 and 14 of the Federal Rules of Criminal Procedure" when presented with the former iteration

314, 320 (3d Cir. 2007) ("It is well-established that '[a]n indictment returned by a legally constituted and unbiased grand jury … *if valid on its face*, is enough to call for trial of the charge on the merits." (alterations and emphasis in original) (quoting *Costello v. United States*, 350 U.S. 359, 363 (1956))).

Ultimately, in light of the District Court's statements – both before and after the earlier appeal in this case – about a perceived unfairness in trying the various witness-tampering counts together, we believe that the Court's "impartiality might reasonably be questioned," *Wecht*, 484 F.3d at 226 (citation and internal quotation marks omitted), and will therefore order that this case be reassigned under § 2106, *see Bertoli*, 40 F.3d at 1414 (noting that supervisory power reassignment has typically been applied "under an 'appearance of impartiality' standard" (citation omitted)). Because the Court's discomfort with the Indictment may well have prompted its evidentiary and case management rulings (*see* Joint App. at 4458 (the Court's statement that it initially dismissed the RICO counts "because at the time I still was

---

of the Indictment. *Bergrin*, 650 F.3d at 276. That authority, of course, is not unyielding or unbounded, *see United States v. Giannattasio*, 979 F.2d 98, 100 (7th Cir. 1992) (Posner, J.) (rejecting a court's direction to a prosecutor to "select five … counts for prosecution" of a fifteen count indictment and proceed to trial on those counts alone, and noting that "[a] judge in our system does not have the authority to tell prosecutors which crimes to prosecute or when to prosecute them"), but, as we have already noted, we need not and do not attempt to delineate its contours as applied to the severance orders entered in this case. *See supra* note 20.

concerned about the RICO allegations, quite frankly, mostly for the same reason")), we direct the judge to whom this case is reassigned to consider anew whether the Indictment should be severed in any respect and, as necessary, the extent to which evidence of the Esteves Plot and the Pozo Plot can properly be used to prove the government's case against Bergrin on the Kemo Murder Counts.[29] *See* 28 U.S.C. § 2106 (affording courts of appeals the authority to "require such further proceedings to be had as may be just under the circumstances"); *cf. Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1252 (10th Cir. 2011) (stating that the "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another"); *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders … remain open to trial court reconsideration, and do not constitute the law of the case.").

## III. Conclusion

For the foregoing reasons, we will vacate the District Court's decision to exclude evidence of the Pozo Plot and will direct the Chief Judge of the District Court to reassign this matter.

---

[29] Although we have vacated the District Court's decision to exclude evidence of the Pozo Plot from Bergrin's retrial, we note, again, that, depending on what is offered in evidence, the new judge may well be asked to determine the admissibility of the Pozo Plot evidence with respect to the Kemo Murder Counts and will, in that event, need to conduct an appropriate Rule 403 balancing. *See supra* note 25.